**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>OPENAI, INC.,<br><br>COPYRIGHT INFRINGEMENT<br>LITIGATION<br><br><br>This Document Relates To:<br><br>All Actions | 25-md-3143 (SHS) (OTW)<br><br>**JOINT INITIAL CASE MANAGEMENT**<br>**CONFERENCE STATEMENT** |

Pursuant to Case Management Order No. 1, the parties jointly submit the following report in advance of the Initial Case Management Conference scheduled for May 22, 2025, at 10:00 am.

## I.    PROPOSED AGENDA

The parties propose the following agenda for the initial conference.

- Appointment of plaintiffs' Leadership Counsel – *see* Section II
- Consolidated class action pleading – *see* Section IV
- Scheduling – *see* Section V
- Deposition protocol – *see* Section V
- Technology tutorial – *see* Section V

## II.    APPOINTMENT OF LEADERSHIP COUNSEL

### A.    Plaintiffs' Positions

All plaintiffs agree that two leadership counsels are warranted: one for the News Plaintiffs, and one for the Class Action Plaintiffs. For purposes of this leadership framework, "News Plaintiffs" include The New York Times Company,[1] the *Daily News* Plaintiffs,[2] Raw Story Media, Inc. and AlterNet Media Inc,[3] The Intercept Media, Inc.,[4] The Center for Investigative Reporting Inc.,[5] as well as Ziff Davis, Inc.[6] The "Class Action Plaintiffs" include the *Tremblay* plaintiffs,[7] and the *Authors Guild* plaintiffs.[8] Because the *Millette* action involves a

---

[1] *The New York Times Company v. Microsoft Corp.* (No. 1: 23-cv-11195).

[2] *Daily News, LP et al.  v. Microsoft Corp.* (No. 1:24-cv-3285).

[3] *Raw Story Media, Inc. et al. v. OpenAI, Inc.* (No. 1:24−01514).

[4] *The Intercept Media, Inc. v. OpenAI, Inc.* (No. 1:24-cv-01515).

[5] *The Center for Investigative Reporting, Inc. v. OpenAI, Inc.* (No. 1:24-cv-04872).

[6] *Ziff Davis, Inc., v. OpenAI Inc.* (25-cv-0501) (D. Del.).

[7] "*Tremblay*" refers collectively to three previously consolidated putative class actions pending in the Northern District of California. *See Tremblay v. OpenAI, Inc.* (No. 3:23−03223); *Silverman v. OpenAI, Inc.*, (No. 3:23−03416); *Chabon v. OpenAI, Inc.* (No. 3:23−04625).

[8] *Authors Guild* refers collectively to two previously consolidated cases: *Authors Guild v. OpenAI Inc.* (No. 1:23-cv-08292); *Alter v. OpenAI Inc.*, (No. 1:23-cv-10211). *Basbanes v. Microsoft Corporation* (No. 1:24−00084), which is also subject to the MDL order, remains

separate group of works and is stayed by agreement of *Millette* counsel, that case should be addressed separately, and appointment of leadership counsel for *Millette* is premature at this stage.[9]

This proposed framework is consistent with how Magistrate Judge Wang has treated the cases proceeding before her—*i.e.*, distinguishing the News Cases from the class cases. In effect, the already consolidated News Cases will be paired with the three newly centralized individual actions (*Raw Story Media, Inc.*, *The Intercept Media, Inc.*, and *Ziff Davis*), while the *Authors Guild* class action will be paired with the two newly centralized class cases.

Defendants do not dispute this dual Class/News structure. However, to the extent the Court finds it valuable, Plaintiffs have set forth below the reasons such a dual structure would be useful. While plaintiffs are together proposing this leadership framework, each plaintiff group explains its respective proposal below, starting with the News Plaintiffs.

### 1.    Necessity and Desirability of Leadership Counsel

#### a.    News Plaintiffs' Position

MDL courts routinely appoint separate leadership where, as here, the MDL includes two distinct groups of cases. Here, News Plaintiffs agree with the Court that leadership counsel should be appointed, but respectfully submit that separate leadership is warranted for the News Cases and the Class Action Cases, for at least three reasons. *First*, the News Cases include lawsuits brought by some of the most prominent and prolific news organizations in the country, who collectively hold more registered copyrights than certain of the proposed classes, as well as the nation's oldest non-profit newsroom and two award-winning digital publishers. For example, The Times has sued on over 10 million registered copyrights. The Daily News Plaintiffs have sued on over 4 million registered copyrights. Ziff Davis has sued on over 1 million registered

---

stayed pending "a ruling on class certification in the consolidated class action litigation [Nos. 1:23-cv-8292; 1:23-cv-10211]." Dkt. 213, No. 1:23-cv-8292.

[9] *Millette v. OpenAI, Inc.* (No. 5:24−04710).

copyrights. Center for Investigative Reporting has registered works going back decades, and The Intercept, Raw Story, and AlterNet have only unregistered works and rely on DMCA claims, which do not have a registration requirement. These companies, other than Ziff Davis, have been litigating these actions since December 2023 (The Times), February 2024 (Intercept and Raw Story/AlterNet), April 2024 (The Daily News), and June 2024 (CIR). *Second*, three of the News Cases have already been formally consolidated for reasons that also apply to the three newly centralized individual actions—namely, all five of these cases are brought by media companies and implicate factual and legal issues not present in the Class Actions Cases. Notably, the centralized parties agreed to this framework and have been working cooperatively to efficiently litigate their cases. *Third*, and relatedly, Magistrate Judge Wang has already been treating the News Cases as distinct from the class action cases, and the most efficient path forward is to follow that same course, particularly, where Defendants waited to seek relief from the JPML until well into the discovery process. Again, all Plaintiffs support there being two sets of leadership counsel.

### (i)    Ample precedent supports Plaintiffs' proposed framework.

As explained by the Bolch Judicial Institute at Duke Law School, for "hybrid" MDLs that contain both class claims and individual claims, courts "should typically appoint different counsel to take primary responsibility" for the individual claims, on the one hand, and the class claims, on the other hand. *See* 102 Judicature 15, 19 (2018); *see also* Manual Complex Lit. § 40.22 ¶ 1 & n.1 (4th ed.) ("In litigation involving different types of claims, such as economic injury and personal injury claims, the court and counsel may wish to create parallel structures for the cases."); Elizabeth Chamblee Burch, *Collected Wisdom on Selecting Leaders and Managing MDLs* at 11, Georgia University School of Law (Jan. 1, 2022) ("[I]t is extraordinarily important to identify potential divisions early when choosing leaders to ensure that if structural conflicts of interest exist among plaintiffs, each subgroup has its own representative at the table . . . .").

Take for example the *In re Toyota* MDL, which addressed alleged defects in Toyota cars

that caused sudden unintended acceleration, causing both economic and personal injuries. *See*
Case No. 8:10-ML-02151 (C.D. Cal.). That MDL was comprised of both "economic loss
consumer class actions," as well as "individual" personal injury cases. *Id.* Dkt. 80 at 26. The
court observed at the outset that any leadership structure would need to reflect how that MDL
"involves both personal injury actions and actions for economic loss." Dkt. 3 at 2. Ultimately,
the court appointed separate leadership teams, including "co-lead counsel" for the individual
personal injury claims and a separate "lead counsel committee" for the economic loss class
action claims. Dkt. 169 at 2. Other courts have likewise appointed separate leadership teams
where an MDL is comprised of two categories of cases. *E.g.*, *Soon Ja Chun v. Korean Air Lines
Co.*, 2011 WL 13308721, at *2 (C.D. Cal. Sept. 12, 2011) (describing how the court "appointed
different co-lead counsel to pursue claims on behalf of [two sets of plaintiffs]"); *In re Graphics
Processing Units Antitrust Litig.*, Case No. 07-01826, Dkt. 18 (N.D. Cal. June 4, 2007)
(appointing separate lead counsel for different groups of plaintiffs). This Court should follow the
same path and appoint two separate leadership teams—one for News Plaintiffs and another for
the Class Action Plaintiffs.

### (ii)    The Court's prior consolidation order supports Plaintiffs' proposed framework.

Magistrate Judge Wang has already formally consolidated three of the News Cases for
discovery purposes, at Defendants' request, and the logic underlying that consolidation supports
treating the three newly centralized individual actions as News Cases for purposes of appointing
leadership. *See Times* Dkt. 304 (order granting Defendants' motion to formally consolidate *The
New York Times* case, the *Daily News* case, and the *Center for Investigative Reporting* case).
Defendants obtained consolidation by stressing the similarities among the News Cases; in their
words, "[a]ll three cases are brought on behalf of news organizations challenging certain of
Defendants' artificial intelligence products," and "[t]he cases bring the same claims, against the
same defendants, accusing the same products." *Times* Dkt. 257 at 1; *see also Times* Dkt. 143 at 7-
8 (Defendants arguing that consolidation is appropriate because "the plaintiffs are all newspaper

publishers," and claiming that consolidation would "help alleviate the burdens and inefficiencies of litigating similar issues across numerous cases"). Like the original three News Cases, the three newly centralized cases are also *individual* actions brought on behalf of media companies. *See The Intercept* SAC ¶ 7; *Raw Story* FAC ¶ 7; *Ziff Davis* Compl. ¶ 34.

The similarities do not end there. All of the News Plaintiffs' claims implicate the outputs of Defendants' products—a topic less relevant to the Class Action Cases. There is no dispute about this key distinction; Defendants have repeatedly stressed it, including in their consolidation motion. Microsoft described how the News Cases "share[]" a "technological focus" that is "distinct from the [SDNY] Class Actions" because the News Cases "accuse the *outputs* of the generative search technology." *Times* Dkt. 148 at 2, 7 (emphases added). OpenAI similarly contends that the News Cases implicate the "outputs" of Defendants' models and products.

The claims alleged in the newly centralized individual actions also implicate the outputs of Defendants' products. For example, The Intercept alleges that ChatGPT "provide[s] or ha[s] provided responses to users that regurgitate verbatim or nearly verbatim copyright-protected works of journalism without providing author, title, copyright, or terms of use information contained in those works." *The Intercept* Dkt. 155 ¶ 64. Judge Rakoff relied on these allegations to deny OpenAI's motion to dismiss The Intercept's DMCA claim under 17 U.S.C. § 1202(b)(1), crediting The Intercept's "downstream infringement" theory for how ChatGPT outputs "can facilitate infringement." *The Intercept* Dkt. 127 at 23. The *Raw Story* Proposed First Amended Complaint includes identical allegations. *See Raw Story* Dkt. 119-1 ¶ 64. The *Ziff Davis* case also implicates the "outputs" of Defendants' models and products. *See Ziff Davis* Dkt. 363 ¶ 109 (alleging that "OpenAI has generated and continues to generate copies or derivatives of Ziff Davis Works, including the Registered Works, in outputs from its LLM products").

Relatedly, only the News Cases include contributory infringement claims predicated on end-user infringement. As summarized in this Court's motion to dismiss opinion, the initial three News Plaintiffs allege contributory infringement "in the alternative to their direct infringement claims to the extent third-party end users—not defendants—are found liable for direct

infringement for generating infringing outputs using defendants' LLMs." *Times* Dkt. 514 at 13. This Court denied Defendants' motions to dismiss these claims, reasoning that News Plaintiffs plausibly allege "copyright infringement by third parties" and that "defendants possessed constructive, if not actual, knowledge of end-user infringement." *Id.* at 16. The *Ziff Davis* case includes a similar contributory infringement claim. *See Ziff Davis* Compl. ¶ 221 ("To the extent that end-users (both consumers and commercial clients) of OpenAI's LLM-based products and services may be found liable for direct infringement of Plaintiffs' copyrights, OpenAI has knowingly and materially contributed to this infringement.").

Yet another difference between the News Cases and the Class Action Cases is that only the News Cases currently include DMCA claims. Judge Rakoff denied OpenAI's motion to dismiss The Intercept's § 1202(b)(1) claim against OpenAI. Intercept Dkt. 127. This Court similarly denied OpenAI's motion to dismiss the § 1202(b)(1) claims brought by The Daily News Plaintiffs and the Center for Investigating Reporting. *See Times* Dkt. 514 at 25 ("The Daily News and CIR complaints, however, plausibly allege CMI removal during the LLM training process."). While this Court dismissed the analogous claim in The Times's case, The Times has filed an unopposed motion to amend its complaint to revive that claim by adding allegations that "mirror the Daily News and CIR complaints." *Times* Dkt. 524-1 at 1. The *Ziff Davis* case includes DMCA claims pursuant to §§ 1201(a)(1) and 1202(b)(1) and (b)(3). *See Ziff Davis* Compl. ¶¶ 233-53. Finally, while currently dismissed and awaiting completion of briefing on plaintiff's motion to reconsider, the *Raw Story* complaint includes just one claim—a DMCA claim under § 1202(b)(1). *Raw Story* Dkt. 119-1. By contrast, there is currently no DMCA claim in any of the Class Action Cases, though the *Tremblay* plaintiffs have moved for leave to amend their complaint to add a DMCA claim in their case. *Tremblay* Dkt. 370 at 8.

These distinctions between the News Cases and the Class Action Cases will reverberate in discovery. *See, e.g.*, *Times* Dkt. 72 at 16 (OpenAI stating that "the scope of discovery [] will differ substantially"). For example, discovery in these cases will address different products, source code, and technology, including the Bing search index, Copilot (formerly known as Bing Chat),

CustomGPTs, SearchGPT, and Browse with Bing. Relatedly, News Plaintiffs have been working to inspect the output logs from Defendants' products, which Defendants acknowledge presents unique challenges. *See* Dec. 3, 2024 Hearing Tr. at 75:1–78:25 (explaining how Microsoft's output logs comprise 15 petabytes of data and "the only way to access [the output logs] is by constructing and running queries that may be very time consuming"). As another example, the News Cases will include discovery into how the Defendants acquire news content for copying, including paywall circumvention and use of web scraping technology. News Plaintiffs will also address damages models and fair use issues within the market for news content—not books—and will seek unique discovery into the ways Defendants commercialized their models to compete with News Plaintiffs.

### (iii)    The Court's approach to discovery thus far supports Plaintiffs' proposed framework.

Since consolidating the three original News Cases, Magistrate Judge Wang has recognized the distinctions between the News Cases and the class action cases proceeding before her and managed the cases accordingly. All four discovery hearings before Judge Wang have included a News Case portion and a separate class action portion. In advance of each hearing, the parties submitted two different agendas: one for the News Cases and one for the class action cases. *See Times* Dkt. 304 (order directing "the parties to each consolidated case" to "file a joint chart"); *compare, e.g.*, *Times* Dkt. 518 (example of a News Case chart), *with Authors Guild* Dkt. 397 (example of a class action case chart). Consistent with the Court's consolidation order, News Plaintiffs have jointly pursued discovery from Defendants, including by jointly requesting document custodians, jointly requesting search terms, and jointly noticing and taking depositions. *E.g.*, *Times* Dkt. 381 (News Plaintiffs' collective motion to compel Microsoft to apply additional search terms to its custodians' ESI). This division has proved workable and productive for the parties and the court. The most efficient path forward is to treat the three newly centralized individual actions as News Cases for purposes of appointing leadership.

Absorbing these actions into the News Cases will be seamless because of the complete overlap in the law firms that represent the News Plaintiffs. Three of the newly centralized

individual plaintiffs (The Intercept, Raw Story, and AlterNet) are represented by the same law firm that represents the Center for Investigative Reporting, which has already been formally consolidated as a News Plaintiff. *Times* Dkt. 304. Liaison counsel for the News Plaintiffs has already been in communication with Klaris Law, counsel for Ziff Davis.

### (iv)    How News Leadership Counsel Should be Structured.

News Plaintiffs agree to appoint one lawyer from the Leadership Committee as News Plaintiffs' Liaison Counsel. That lawyer will be Davida Brook, of Susman Godfrey. Ms. Brook is co-lead counsel for the New York Times, and has been involved in this and other pending AI litigation for the past several years. She has also served as lead or co-lead counsel in numerous other matters, both class and individual, including *Chegg v. Google*, the *Dominion Voting Systems* cases, *Sony Pictures Entertainment v. CBS*, *CDS Litigation, LLC v. Align Technology, Inc., et al.*, and *Jane Doe v. MindGeek USA Inc.* As part of her role in this action, she has been regularly appearing before this Court from the inception of this litigation and coordinating with the other News Plaintiffs for the past several years. Liaison Counsel shall have the administrative responsibilities defined below.

News Plaintiffs also agree to appoint a Leadership Committee comprised of the following four law firms and six attorneys:

- Susman Godfrey (counsel for The Times)
  - Lead: Ian Crosby
  - Co-Lead: Davida Brook
- Rothwell Figg (counsel for The Times and the *Daily News* Plaintiffs)
  - Lead: Steven Lieberman
  - Co-Lead: Jennifer Maisel
- Loevy and Loevy (counsel for CIR, The Intercept, Raw Story, and AlterNet)
  - Lead: Matthew Topic
- Klaris Law (counsel for Ziff Davis)

9

       o   Lead: Lance Koonce

This Leadership Committee shall have the responsibilities defined below.

       Susman Godfrey and Rothwell Figg should be on the Leadership Committee because these firms have been involved in these cases longer than any other firm on the News side, and these firms have devoted substantial time and effort to prosecuting discovery on behalf of the consolidated News Plaintiffs. Susman Godfrey and Rothwell Figg together represent Plaintiff The New York Times Company, which filed the first of the five individual actions—on December 27, 2023. When appointing leadership, courts routinely select firms that initiated the operative claims. *See, e.g.*, *In re Insulin Pricing Litig.*, 2017 WL 4122437, at *3 (D.N.J. Sept. 18, 2017) (appointing as interim co-lead counsel the two firms who "invested" substantial time "developing the class's claim" and "filed the first complaint"); *In re Mun. Derivatives Antitrust Litig.*, 252 F.R.D. 184, 186 (S.D.N.Y. 2008) (appointing as co-lead counsel multiple firms that "filed the first complaints in this case" and "have a substantial history of investigating the potential claims in this action").

       Loevy and Loevy should also be on the Leadership Committee. Loevy and Loevy represents more News Plaintiffs than any other firm on the News team (CIR, The Intercept, Raw Story, and AlterNet). Moreover, Loevy and Loevy was the first firm on the News team to overcome a motion to dismiss a DMCA claim, and their clients either have only DMCA claims, or have DMCA claims that significantly outnumber their copyright infringement claims. *See The Intercept* Dkt. 127 at 23 (Order from Judge Rakoff denying OpenAI's motion to dismiss The Intercept's 17 U.S.C. § 1202(b)(1) claim). Klaris Law should be on the Leadership Committee in light of its extensive experience in copyright and technology law, as well as its client Ziff Davis's significant position in the publishing industry, exemplified by the fact that its claims involve over 1 million registered works. Going forward, counsel for any media companies who file new individual lawsuits that become centralized within this MDL will not be part of News Plaintiffs' Leadership Committee.

       Although they do not oppose a dual leadership structure, Defendants take issue with the News Plaintiffs proposed structure as apparently there are too many firms on the proposed

Leadership Committee. This argument rings hollow. The three firms historically representing the News Plaintiffs have coordinated nearly perfectly to date. For example, there have been no disputes with different clients, and therefore firms, taking different positions on what the case schedule should be. There likewise have been zero issues with dividing time for discovery or even case dispositive oral arguments. The same is true in this joint submission where all News Plaintiffs — indeed all plaintiffs — agree to a singular schedule and practically everything else. There is thus zero reason to believe that the News Plaintiffs proposed structure, which largely mirrors how this case has been efficiently run by the News Plaintiffs to date, will be in any way problematic.

That said, News Plaintiffs did recognize the need for a clear point of contact for the Court, Defendants, Class Plaintiffs, etc., to reach out to should there be any issues. They have provided that person in the form of Liaison Counsel. The News Plaintiffs understand this to be a typical structure, particularly for individual cases, in a MDL proceeding such as this. *See, e.g.*, Pretrial Order Nos. 2, 36, 89, *In re: Generic Digoxin and Doxycycline Antitrust Litigation*, 16-MD-2724. And request the Court adopt it here.

### b.  Class Plaintiffs' Position

### (i)  Overall Leadership Framework

Class Plaintiffs agree that leadership counsel should be appointed. Class Plaintiffs also agree with News Plaintiffs and Defendants that separate leadership is warranted for the News Cases and the Class Action Cases, largely for the reasons set forth by the News Plaintiffs above. (Because the *Petryazhna* action (focused on YouTube videos) involves a separate group of works and is stayed by agreement of *Petrayazhna* counsel, that case should be addressed separately, and appointment of leadership counsel for *Millette* is premature at this stage.[10])

---

[10] *Millette v. OpenAI, Inc.* (No. 5:24−04710).

### (ii)    How Class Leadership Counsel Should Be Structured

As explained further below, the Class Plaintiffs propose that four firms should be appointed as leadership counsel, with two from the *Authors Guild* Action and two from the *Tremblay* Action. This takes as a starting point the current structure, with three interim co-leads, and modifies to reflect the integration of the Tremblay matter into this case. Class Plaintiffs also propose the creation of a steering committee with a Chair. Class Plaintiffs' unanimous leadership recommendation represents an array of highly skilled counsel with diverse backgrounds and experience proven by their effective leadership of the *Tremblay* and *Authors Guild* matters before centralization. Class Plaintiffs' proposal would unify counsel for the *Tremblay* and *Authors Guild* actions and reflects the cooperation and coordination Class Plaintiffs have already engaged amongst themselves before centralization. Further, Class Plaintiffs' proposal reflects their consensus as to what they believe would be the best team that would effectuate the just and speedy determination of this litigation. Fed. R. Civ. P. 1.

Specifically, the Class Plaintiffs respectfully request that the Court appoint Lieff Cabraser Heimann & Bernstein LLP (LCHB), Susman Godfrey LLP (SG), The Joseph Saveri Law Firm, LLP (JSLF), and Boies Schiller Flexner LLP (BSF) to serve as interim co-lead counsel for the Class Cases. The Class Plaintiffs also respectfully request that the Court appoint Cafferty Clobes Meriwether & Sprengel LLP (CCMS) as Chair of the Steering Committee and Cowan, DeBaets, Abrahams & Sheppard LLP (CDAS) and Matthew Butterick, Esq. as members of the committee. The steering committee will advise and fully support the co-lead counsel.

Defendants' concerns about efficiency are unfounded. As an initial matter, Defendants' statements that Class Plaintiffs have not been coordinating is belied by the empirical experience prior even to the creation of the MDL. Class Plaintiffs have been working closely for months (and as to some issues nearly a year), holding weekly meetings, mirroring and jointly negotiating subpoenas, presenting an all-Class-Plaintiff deposition protocol to Judge Wang, attending joint mediations, and coordinating on the substance and dates of depositions. Since the JPML's centralization order, that coordination has continued and ramped up demonstrably. For example,

Plaintiffs have established a subpoena subgroup that has been on every recent email with former employees, and a representative of each group has attended each meet-and-confer regarding former employee productions for several weeks. Where Class Plaintiffs have not be able to coordinate, it was due either to circumstances inherent in separate actions and/or, notably, due to Defendants' refusal to permit the sharing of protective order material. [11] Both issues can and should be resolved in this proceeding, *see* section IX.A.2 below, and present no impediment to Class Plaintiff's proposed leadership structure.

Even where (unlike here) there is not the long and effective history of an existing multi-firm structure, courts have considered and rejected defendants' desire for a sole lead where Plaintiffs' counsel have demonstrated success working collaboratively. *See, e.g.*, *Bloom v. Anderson*, No. 2:20-CV-04534, 2020 WL 6710429, at *9 (S.D. Ohio Nov. 16, 2020), *supplemented*, No. 2:20-CV-04534, 2020 WL 6737655 (S.D. Ohio Nov. 17, 2020) ("In light of their demonstrated success in working together as co-lead counsel, this Court is confident that the two firms will be able to speak with one voice and coordinate appropriately to streamline procedure."). This case is no different. Class Plaintiffs' leadership proposal simply unifies as one the counsel from the *Tremblay* and *Authors Guild* matters, who have already been jointly litigating this case in an efficient and just manner to avoid duplication and contradiction. Further, Class Plaintiffs' proposal is a common structure even based on a quick perusal of cases in which proposed lead counsel here are presently or recently serving as MDL co-lead counsel. *See, e.g.*, *In re: Glucagon-Like Peptide-1 Receptor Agonists (GLP-1 RAS) Prods. Liab. Litig.*, No. 24-md-03094 (E.D. Pa.); *In re: Juul Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 19-md-2913 (N.D. Cal.); *In re Outpatient Medical Center Employee Antitrust Litig.*, 1:21-cv-00305, Dkt. No. 50 (N.D. Ill. July 9, 2021). And, Defendants' opposition to Class Plaintiffs' leadership structure should not be credited. Not only are they in no position to know what is most efficient for Class

---

[11] For example, OpenAI has still not shared with the *Tremblay* Plaintiffs the transcript of the Rule 30(b)(6) deposition conducted by the *Authors Guild* and News Plaintiffs with respect to training data and certain custodial topics.

Plaintiffs, but they stand to benefit most from disrupting a proposal that Class Plaintiffs have decided will best advance the interests of the class.

### (iii)    Basis for the Class Leadership Counsel Structure and Appointment

The Class Plaintiffs have reached unanimous agreement that this structure and selection of firms provides a diversity of backgrounds, skills, expertise and roles, which will provide the Court with an experienced and effective team to efficiently advance the class actions in this MDL. The appointment of these four firms as leadership counsel for the Class Cases, to be advised by a steering committee, is also in accord with the primary consideration in choosing class leadership in complex cases: "achieving efficiency and economy without jeopardizing fairness to the parties." Manual for Complex Litig. § 10.221 (4th ed. 2004). The proposed firms were among the first to bring claims challenging the conduct of Defendants in this action, and each have put in significant resources in identifying and investigating potential claims in this action. Fed. R. Civ. P. 23(g)(1)(A)(i). They also have extensive knowledge of the applicable law in this case, both regard with federal class actions under Rule 23, and with regard to the applicable law. *See* Fed. R. Civ. P. 23(g)(1)(A)(iii). And each of them work collaboratively and inclusively as a matter of principle in order to serve the best interest of their clients and the putative classes. *See* Fed. R. Civ. P. 23(g)(1)(A)(iv). The firms' qualifications are self-evident from their prior casework in the *Tremblay* and *Authors Guild* Actions on behalf of the Class Plaintiffs, and their efforts have substantially advanced their respective cases before centralization by the JPML. Each of the four firms in the proposed leadership counsel and the firms and counsel in the steering committee have the resources and resolve to ensure the interests of the Class Plaintiffs are zealously prosecuted to a fully and fair resolution.  The appointment of LCHB, SG, JSLF, and BSF as leadership counsel, CCMS as Chair of the steering committee, and CDAS and Mr. Butterick as members of the committee, represents the leadership structure "best able to represent the interest of the class." Fed. R. Civ. P. 23(g)(2).

The proposed leadership counsel base their application on the below:

*First,* the *Tremblay* and *Authors Guild* Plaintiffs' efforts over the last 20 months have materially and efficiently moved the case forward for the benefit of the putative classes, both in the parallel underlying cases, and in coordinated fashion.  On February 6, 2024, SG, LCHB, and Cowan DeBaets were appointed as co-lead interim class counsel in the *Authors Guild* case after a review of the Counsel's work and related experience. Dkt. 70. With LCHB and SG at the helm as Interim Class Counsel for the *Authors Guild* Action, the case has moved forward quickly and efficiently, and these firms should now be appointed co-lead for the Class Cases. JSLF and BSF likewise have effectively prosecuted the *Tremblay* Action (alongside CCMS and Mr. Butterick), making major headway before consolidation in the MDL.

Across the *Tremblay* and *Authors Guild* actions, SG, LCHB, JSLF and BSF have served hundreds of discovery requests; conducted dozens of meet and confers; filed over twenty motions to compel, and participated in a number of discovery and settlement conferences before Magistrate Judges Wang and Illman. These efforts have secured the production of hundreds of thousands of documents from Defendants. Those documents are highly relevant to both Defendants' willfulness and liability, including by showing that Defendants have paid millions in AI training licensing fees, confirming the existence of the type of licensing market cognizable under the Fourth Factor of the fair use analysis. *See Hachette Book Grp., Inc. v. Internet Archive*, 664 F. Supp. 3d 370, 388-89 (S.D.N.Y. 2023), *aff'd*, 115 F.4th 163 (2d Cir. 2024) (existence of "thriving . . . licensing market" suggests applicable factor-four market); *Fox News Network, LLC v. Tveyes, Inc.*, 883 F.3d 169, 180 (2d Cir. 2018) (willingness to pay for access to copyrighted content demonstrates "plausibly exploitable market" under fair use analysis). Those law firms have each retained and worked closely with technical experts to go on site over the course of a number of days and inspect OpenAI's voluminous training datasets. They have engaged in extensive third-party discovery, serving subpoenas on a swath of former employees, not to mention book publishers and financial institutions, as well enforcing deposition subpoenas to the two former OpenAI employees who were the principal architects of the books datasets at issue in the case. They have also taken depositions of current OpenAI employees, and taken and

defended depositions under Rule 30(b)(6).

_**Second**_, LCHB, SG, JSLF, and BSF have the experience, resources, and track record of success in complex class actions and complex intellectual property matters to lead this case.[12]

_Lieff Cabraser (LCHB)._ LCHB is a nationwide plaintiffs' class action firm with 125+ attorneys and U.S. offices in New York, San Francisco, and Nashville. Founded in 1972, the firm has recovered over $129 billion in verdicts and settlements.[13] LCHB has a long history of vigorously prosecuting claims against some of the largest corporations, including technology corporations, in the world.  In 2025, U.S. News & Best Lawyers named LCHB one of its "Best Law Firms," and, in 2024, Law360 awarded LCHB in both the Cybersecurity & Privacy Group and Class Action Practice Group of the Year categories. LCHB's recent experience includes achieving a number of $100+ million recoveries in major, cutting-edge matters where the firm served as lead or co-lead counsel—_see, e.g., Chen-Oster v. Goldman Sachs_, Case No. 10-6950 (S.D.N.Y.) (LCHB, as co-lead counsel, obtained a $215 million class settlement, along with programmatic relief, for plaintiffs in a gender discrimination class action lawsuit against Goldman Sachs); _In re Juul Labs Mktg. Sales Practices & Prods. Liab. Litig._ 20-cv-8177 (N.D. Cal.) (LCHB served as co-lead counsel for plaintiffs in nationwide multidistrict litigation regarding the Juul electronic-cigarette, securing over $2.5 billion in settlements for plaintiffs and class members)— and in complex cases with multiple stakeholders—_see, e.g., City and County Of San Francisco et al. v. Purdue Pharma L.P. et al._, No. 3:18-Cv-07591 (N.D. Cal.) (LCHB prevailed over Walgreens in a landmark bench trial, which helped precipitate a $14 billion national settlement of the opioids litigation by chain pharmacies; LCHB also serves as lead counsel in other Opioids related

---

[12] Each of these four firms have deep experience litigating copyright class actions against Artificial Intelligence ("AI") companies. In addition to the instant matter, the firms are currently litigating similar copyright class actions against other technology companies including Anthropic PBC, Databricks, Inc., Meta Platforms, Inc., Stability AI, GitHub, and NVIDIA Corporation.

[13] See https://www.lieffcabraser.com/pdf/Lieff_Cabraser_Firm_Resume.pdf (LCHB resume).

litigation); *Norfolk Southern Train Derailment* (2024 settlement).[14]  LCHB's team is led by Rachel Geman, a nationally recognized partner in the New York office with decades of experience in complex class action and fraud matters, ranging from cutting-edge technology cases (e.g., co-lead class counsel in *Plaid Financial Privacy*, $58 million settlement and programmatic relief), to civil and human rights cases (e.g., co-lead class counsel in *Doe v. MasterCorp*, EDVA (2024), forced labor TVPRA class settlement; *Chen-Oster v. Goldman Sachs* (above)), to consumer protection matters, to her role in recovering hundreds of millions in False Claims Act and whistleblower matters. In addition to the LCHB partners and associates discussed in last year's leadership application who are working with Ms. Geman on this litigation, such as Reilly Stoler, other members of the LCHB team include Kenneth S. Byrd, an experienced trial attorney.

    *Susman Godfrey (SG).* SG has extensive experience in handling complex class actions and copyright disputes, including some of the largest and most complex cases in the nation, and has demonstrated that it has the ability and resources to handle such cases effectively and efficiently. Since the firm's founding in 1980, SG has served as lead counsel in hundreds of class actions and complex copyright disputes in courts throughout the country, including several in this District.[15] SG's litigation savvy and class action proficiency are reflected in its recognition as the county's leading trial firm. The firm was named "Litigation Boutique of the Year" in 2023 by The American Lawyer, "Commercial Litigation Firm of the Year" in 2023 by Benchmark Litigation, and among

---

[14] https://www.lieffcabraser.com/2024/09/norfolk-southern-train-derailment-settlement-approved/.

[15] *See, e.g., Melissa Ferrick et al. v. Spotify USA Inc., et al.,* No. 1:16-cv-08412-AJN (S.D.N.Y.) (appointed co-lead counsel for settlement purposes and secured a settlement valued at $112 million on behalf of a class of composition owners for claims of nonpayment of royalties for music streaming); *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 2:13-cv-05693-PSG-GJS (C.D. Cal.) (appointed co-lead counsel and secured $25.5 million and additional royalties); *In re Libor-based Financial Instruments Antitrust Litigation*, No. 11-md-02262 (S.D.N.Y.) (appointed co-lead class counsel and secured $780 million in settlements for plaintiffs who allege several banks were involved in setting LIBOR and manipulating it to their advantage); *In re Automotive Parts Antitrust Litigation*, No. 12-md-02311 (E.D. Mich.) (appointed co-lead class counsel and secured over $1.2 billion in settlements to date for a class of end payor plaintiffs against dozens of automobile suppliers who engaged in price-fixing and bid-rigging).

five finalists for "Law Firm of the Year" and "Litigation Boutique of the Year" in 2024 by Texas Lawyer (with firms multiple its size). SG's recent successes include securing a $1.6 billion judgment for BML Properties, Ltd. against China Construction America, Inc. arising out of the latter's fraud in developing a Bahamian luxury resort; securing a $418 million joint settlement on behalf of a nationwide class of home sellers; and securing a $266 million jury verdict for the City of Baltimore against McKesson and AmerisourceBergen for their role in manufacturing and distributing opioids.

SG's team is led by Justin A. Nelson and Rohit D. Nath, two nationally recognized attorneys with decades of combined experience in class actions and intellectual property cases involving cutting-edge technology. Mr. Nelson, a former law clerk to the Honorable Sandra Day O'Connor of the United States Supreme Court, recently represented Dominion Voting Systems against Fox News in helping secure the landmark $787.5 million settlement arising from the latter's defamatory news coverage claiming that Dominion's voting machines were responsible for massive voter fraud during the 2020 U.S. presidential election. Mr. Nelson was recently named an advisor to The American Law Institute's Principles of the Law, Civil Liability for Artificial Intelligence Project. Mr. Nath, a former law clerk to the Honorable Alex Kozinski of the United States Court of Appeals for the Ninth Circuit, has also secured hundreds of millions of dollars in settlements. Mr. Nath's recent successes in this District include *Bernstein v. Cengage Learning, Inc.*, No. 18CIV7877VECSLC, (S.D.N.Y.), where he helped secure a $21 million settlement for textbook authors, and *In re: AXA COI Litigation*, No. 16-cv-740 (S.D.N.Y.), which resulted in a $307.5 million settlement on behalf of a class of insurance policyholders. SG also represents putative class action plaintiffs in actions against other LLM companies including Anthropic and Databricks.

*The Joseph Saveri Law Firm (JSLF).* The Joseph Saveri Law Firm, along with Matthew Butterick, filed the first of these cases against OpenAI on June 28, 2023, two months prior to any other case, which (in large measure) became the model for all subsequent cases filed. JSLF attorneys, and in particular its managing partner and founder Mr. Joseph Saveri, in conjunction

with Mr. Butterick are pioneers in this area of law, bringing the first lawsuit in the United States (and in the world) challenging the unauthorized use of information in connection with generative AI models, including the large language models at issue in this case. While other firms may boast of a higher head count, few if any can say they have as many attorneys devoted to the practice of generative AI law. JSLF's experience is exemplified in the cases it has prosecuted as lead counsel. For example, as sole lead counsel for the direct purchaser plaintiffs in *In re Capacitors Antitrust Litigation*, No. 3:17-md-02801-JD (N.D. Cal.), JSLF successfully managed over 40 million pages of discovery (nearly all in Japanese) from 22 corporate defendant families, and coordinated with separate counsel for the indirect purchaser-class, opt-outs, and the DOJ.

JSLF works collaboratively and inclusively as a matter of principle in order to serve the best interest of its clients. Through decades of experience, Mr. Saveri and JSLF attorneys have developed collaborative skills and efficient approaches to litigation decision making and problem solving. Towards that goal, JSLF strives to provide meaningful opportunities for courtroom experience to early career lawyers from diverse backgrounds—not only its own but also those of co-counsel.[16] JSLF offers intra-firm mentorship and courtroom opportunities to junior attorneys at other firms that it partners with. JSLF is committed to those as core values, shared amongst its co-counsel, and would ensure they are advanced here.

*Boies Schiller Flexner LLP (BSF).* BSF is an elite international litigation firm with over 200 trial and appellate lawyers which has served successfully as lead or co-lead counsel in numerous complex class actions including currently *In re Google Digital Advertising Antitrust Litigation* MDL (S.D.N.Y.) (the Honorable P. Kevin Castel), *In re FTX Cryptocurrency Exchange Collapse Litigation* MDL (S.D. Fla.), *Rodriquez v. Google* (N.D. Cal.), and (as interim lead counsel*) Kadrey v. Meta Platforms* (N.D. Cal.)—a similar copyright infringement putative

---

[16] JSLF's commitment to this is apparent in numerous recent cases where young and diverse lawyers had meaningful courtroom roles, including the jury trial in *In re Capacitors Antitrust Litigation, In re Juul Labs, Inc. Antitrust Litigation*, and numerous other cases pending in federal court.

class action on behalf of authors. BSF also recently served as co-lead counsel in both the *In re Blue Cross Blue Shield Antitrust Litigation* MDL (securing a record $2.67 billion settlement) and the *In re Takata Airbag Products Liability Litigation* MDL (securing $1.5 billion).

BSF also has a long history of productive cooperation in class/MDL litigation with a leadership structure similar to that proposed here:

- **In re General Motors LLC Ignition Switch Litigation, MDL No. 2543 (S.D.N.Y.):** BSF was an integral part of a multi-faceted plaintiffs' leadership, serving on the Executive Committee. This structure included three Co-Lead Counsel firms, Plaintiff Liaison Counsel, and Federal/State Liaison Counsel, all collaborating to manage this highly complex MDL, which resulted in significant resolutions for plaintiffs.

- **In re Takata Airbag Products Liability Litigation, MDL No. 2599 (S.D. Fla.):** BSF served as one of four lead lawyers appointed by the Court. In this structure, BSF co-led the economic loss class actions alongside counsel from another firm, while two additional lawyers from different firms oversaw the personal injury claims, demonstrating a successful, collaborative approach.

- **In re Municipal Derivatives Antitrust Litigation, MDL No. 1950 (S.D.N.Y.):** BSF appointed by the Court as one of three interim co-lead counsel firms. This three-firm leadership effectively shared top-tier plaintiff responsibilities, navigating complex antitrust issues and achieving substantial settlements exceeding $220 million.

- **In re Polyurethane Foam Antitrust Litigation, MDL No. 2196 (N.D. Ohio):** BSF was appointed as Interim Co-Lead Counsel for the Direct Purchaser Class, sharing this role with counsel from another firm. This leadership was further supported by a multi-firm Plaintiffs' Executive Committee, on which other firms served, showcasing a structure where BSF held a principal leadership role while cooperatively managing the litigation with a broader group of firms, leading to settlements of over $400 million.

BSF's excellence and accomplishments have been recognized by virtually every legal publication (including being named Class Action Law Firm of the Year by Law 360 last year), as

well as by the courts before whom BSF served as lead counsel. In one of the most notable recent cases, BSF served as co-lead counsel in the litigation against JPMorgan Chase & Co. on behalf of victims of Jeffrey Epstein. Of the $290 million settlement, U.S. District Judge Jed Rakoff remarked, "in my 27 years on the bench, I have not seen such a good settlement arrive in such a short order, of a case of similar complexity."

The BSF team in the Class Cases will led by David Boies, one of the most celebrated trial lawyers in the country, along with Jesse Panuccio, the former third-ranking official at the U.S. Department of Justice, and Maxwell V. Pritt, the leader of BSF's California offices and a veteran of major technology-related litigations, including *Waymo v. Uber*.

### (iv) Basis for the Appointment of the Steering Committee

The Class Plaintiffs also propose that the Court appoint a Steering Committee to be chaired by CCMS and also comprised of CDAS and Matthew Butterick, Esq., each of whom bring substantial experience and expertise to the Class Cases.

*Cafferty Clobes Merriwether & Sprengel LLP (CCMS).* Cafferty Clobes Meriwether & Sprengel, LLP is a Chicago based, national class action firm with decades of experience successfully leading large national MDLs in federal courts around the country. CCMS filed the second of these cases against OpenAI and currently represents award-winning authors including Andrew Sean Greer, David Henry Hwang, Junot Diaz, Laura Lippman, and Ta-Nehisi Coates in this case and three other similar copyright infringement class actions challenging the use of pirated work to train and develop generative-AI large language models ("LLMs"). *See Kadrey et al. v. Meta Platforms, Inc.*, No. 3:23-cv-03417-VC (N.D. Cal); *In re Mosaic LLM Litigation*, No. 3:24-cv-01451-CRB (N.D. Cal.); *Nazemian et al. v. Nvidia Corp.*, No. 4:24-cv-01454-JST). CCMS, and named partner Bryan Clobes, have helped lead, manage and litigate all aspects of these four AI LLM cases and are working very effectively in these cases (and other cases) with the lawyers and firms seeking to be appointed Co-Lead Counsel in this case.

Mr. Clobes and Cafferty Clobes have decades of experience successfully leading and litigating large, complex MDL class cases. *See* https://caffertyclobes.com; *In re Insurance Brokerage Antitrust Litig.,* MDL No. 1663 (D.N.J.) (served as one of two Co-Lead Counsel in antitrust class case against insurers and brokers resulting in settlements of over $270 million); *In re Cattle and Beef Antitrust Litigation*, MDL 3031 (D. Minn.) (currently serving as one of two Co-Lead Counsel on behalf of a national class of cattle ranchers in a price suppression conspiracy case and have already secured partial settlements totaling over $100 million); *In re: Consumer Vehicle Driving Data Tracking Collection*, No. 1:24-md-03115-TWT (N.D. Ga.) (currently serving as one of several Co-Lead Counsel in case on behalf of tens of millions of vehicle owners and lessees against GM and credit reporting agencies for illegally collecting and selling driver and driving data).

Cowan, DeBaets, Abrahams & Sheppard LLP ("CDAS"). For more than 30 years, CDAS has handled sophisticated and cutting-edge copyright matters on behalf it its diverse client base in the media, entertainment, and publishing industries. CDAS provides counseling and advice regarding, *inter alia*, registration, protection, enforcement, licensing, best practices and risk avoidance, infringement analysis, and fair use reviews. The firm's litigators have been involved in many important, precedent-setting copyright matters across the country in the district courts and courts of appeal and have successfully prosecuted and defended complex and nuanced disputes via motion practice, trial, and negotiated settlements. *See, e.g.*, *teamLab, Inc. v. Museum of Dream Space, LLC et al.*, No. 19-cv-6906-PSG (C.D. Cal.) (represented an art collective in a copyright infringement case dealing with copying of interactive digital art installations; prevailed on summary judgment regarding protectability of art installations and established extrinsic substantial similarity); *Kanongataa v. Coed Media Grp.*, No. 16-cv-7472 (S.D.N.Y.) (defended a copyright infringement case against media outlet for reporting on the plaintiff's accidental live streaming of his wife's labor; prevailed on motion to dismiss on fair use and de minimis use grounds); *Al Hirschfeld Foundation v. Margo Feiden Gallery*, No. 16-cv-4135-PAE (S.D.N.Y.) (represented the late artist's foundation against his former gallerist for breach of contract and

copyright infringement; prevailed after a bench trial on damages and obtained nearly all the relief sought); *Frida Kahlo Corp. v. Artists Rights Society Inc.*, No. 1:2021cv-00635 (D. Col.) (prevailed on motion to dismiss declaratory judgment action relating to copyright status of Frida Kahlo paintings; established lack of subject matter jurisdiction where preemptive suit was not based on a justiciable controversy); *16 Casa Duse v. Merkin*, 13-3865 (2d Cir.) (prevailed on summary judgment below on behalf of film production company; appeal court affirmed that a director's contribution to a motion picture is not, itself, a work of authorship subject to copyright protection); *Walker v. Carter*, 17-2483 (2d Cir.) (represented famous rapper in copyright dispute over logo design for legendary rap music label; prevailed on summary judgment and appeal, establishing precedent regarding statute of limitations on copyright ownership claims); *see also, e.g.*, *Oracle v. Google*, 18-956 (U.S. Supreme Court) (amicus counsel); *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, No. 22-7063 ( D.C. Cir.) (amicus counsel); *Authors Guild v. Google* 13-4829 (2d Cir.) (amicus counsel) *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 180 (2d Cir.) (amicus counsel). The firm's lawyers are also thought leaders in the field of copyright law, holding past and present leadership positions with the ABA, the Copyright Society of the USA, the New York City Bar, and the MLRC, and are frequent writers and speakers on the latest topics in copyright law, particularly its intersection with new technology (most recently, generative AI).

*Matthew Butterick, Esq.* Matthew Butterick is the primary architect of the first wave of AI copyright cases, including *Tremblay v. OpenAI*, the first-filed case in this MDL. Mr. Butterick, along with JSLF, were the first to challenge the legality of generative AI systems by filing a set of seven groundbreaking cases challenging the practices of generative AI companies, and pioneered and crafted discovery techniques which have since been more widely adopted.

Mr. Butterick has been a professional author, typographic designer, and software programmer for over 30 year, with works including a paperback about typographic design (Typography for Lawyers), a digital-font library (mbtype.com), and an open-source web-publishing system. But like so many other authors, artists, and programmers, Mr. Butterick's

works were copied for the training datasets of commercial generative-AI systems without consent, credit, or compensation. Mr. Butterick's experience both as an advocate and as a creative professional places him in a unique position to be a strong advocate for the Class.

### 2.    Necessity and Desirability of a Steering Committee

#### a.    News Plaintiffs' Position

No steering committee is necessary for the News Cases, particularly because there are a small number of law firms involved on the News side. Before the addition of Ziff Davis, the six News Plaintiffs are represented collectively by three law firms: Susman Godfrey (The Times), Rothwell Figg (The Times and The Daily News Plaintiffs); and Loevy and Loevy (CIR, The Intercept, Raw Story, and AlterNet). These firms have a strong working relationship; in fact, they have already been working together since October 2024 given formal consolidation of *The Times*, *Daily News*, and *CIR* cases. Counsel for the existing News Cases also expects to work well with counsel for Ziff Davis,[17] and that coordination is already well underway.

#### b.    Class Plaintiffs' Position

As noted above, Class Plaintiffs respectfully request the appointment of a steering committee consisting of Cafferty Clobes Merriwether & Sprengel LLP (CCMS), Cowan, DeBaets, Abrahams & Sheppard LLP (CDAS) and Matthew Butterick, Esq., with CCMS serving as Chair of the steering committee. These firms' and Mr. Butterick's skills, expertise, and background will assist the leadership counsel in prosecuting the Class Case in this MDL justly and efficiently. CCMS, CDAS and Mr. Butterick each have significant experience litigating cases against generative AI companies, which complements the MDL experience that the four leadership counsel possess. Indeed, each of these firms and Mr. Butterick have already demonstrated their skills and experience in advancing both the *Tremblay* and *Authors Guild* Actions. While each member of the steering committee is highly qualified and could have moved

---

[17] Ziff Davis is represented by Klaris Law with support from Ruttenberg IP Law.

for lead counsel, each has stepped back to support the leadership structure for the Class Cases, as requested herein by the Class Plaintiffs for the Court's approval and appointment.

### 3.    Structure of Leadership Counsel and Process for Appointment

#### a.    News Plaintiffs' Position

Because News Plaintiffs have agreed on appointments for Liaison Counsel and the Leadership Committee, there is no need for any process to select liaison or leadership counsel. Rather, the News Plaintiffs request the Court issue an order adopting the agreed upon structure.

#### b.    Class Plaintiffs' Position

Because Class Plaintiffs have agreed on appointments for the Leadership Counsel and the Steering Committee, there is no need for any process to select leadership counsel or a steering committee. Rather, Class Plaintiffs request the Court issue an order adopting the agreed upon structure.

### 4.    Responsibilities and Authority of Leadership Counsel

#### a.    News Plaintiffs' Position

Consistent with the Manual for Complex Litigation, Fourth §§ 10.221 and 40.22, News Plaintiffs' Leadership Committee shall have the authority to perform or delegate the following tasks on behalf of all News Plaintiffs:

i. Call meetings of counsel for News Plaintiffs for any appropriate purpose, including coordinating responses to questions of other parties or the court. Initiate proposals, suggestions, schedules, or joint briefs, and any other appropriate matter(s) pertaining to pretrial proceedings;

ii. Develop and propose to the court schedules for the commencement, execution, and completion of all discovery on behalf of all News Plaintiffs;

iii. Coordinate with leadership counsel for the Class Action Plaintiffs and, where appropriate;

iv. Coordinate and conduct discovery on behalf of News Plaintiffs consistent with the requirements of Fed. R. Civ. P. 26(b)(1), 26(2), and 26(g). However, no attorney for a News Plaintiff will be excluded from attending the examination of witnesses and other proceeding, and such attorney may suggest questions to be posed to deponents provided that such questions are not repetitious;

v. Cause to be issued in the name of all News Plaintiffs any necessary discovery requests, motions, and subpoenas pertaining to any witnesses and documents

   needed to properly prepare for the pretrial discovery of relevant issues found in the pleadings of this litigation;

 vi. Delegate specific tasks to other News Plaintiffs' counsel, including but not limited to examining witnesses at depositions and arguing motions at court hearings on behalf of all News Plaintiffs;

 vii. Act as spokesperson for all News Plaintiffs at pretrial proceedings and in response to any inquiries by the court, subject to the right of any News Plaintiffs' counsel to present non-repetitive individual or different positions;

 viii. Enter into stipulations with Class Action Plaintiffs and opposing counsel as necessary for the conduct of the litigation;

 ix. Prepare and distribute periodic status reports to the parties;

 x. Maintain adequate files of all pretrial matters and have them available, under reasonable terms and conditions, for examination by News Plaintiffs or their attorneys'; and

 xi. Perform such other duties as may be incidental to proper coordination of News Plaintiffs' pretrial activities or authorized by further order of the Court.

Liaison Counsel for News Plaintiffs shall have the following administrative responsibilities:

 i. Act as the primary contact between the Court and News Plaintiffs' counsel;

 ii. Maintain an up-to-date, comprehensive service list of News Plaintiffs and promptly advise the Court, Class Action Plaintiffs, and defense counsel of changes to News Plaintiffs' Service List; and

 iii. Receive and distribute to News Plaintiffs' counsel, as appropriate, orders, notices, and correspondence from the Court, to the extent such documents are not electronically filed.

Notwithstanding the proposed appointment of Liaison Counsel, News Plaintiffs' position is that each counsel may participate in all proceedings before the court as fully as such counsel deems necessary. Liaison Counsel shall not have the right to bind any party as to any matter without the consent of counsel for that party, except Liaison Counsel's own clients.

### b. Class Plaintiffs' Position

Consistent with the Manual for Complex Litigation, Fourth §§ 10.221 and 40.22, in addition to the responsibilities listed above, Class Plaintiffs' Leadership Counsel shall have the authority to perform or delegate the following tasks on behalf of all Class Plaintiffs, as listed above for News Plaintiffs:

i.      Convene meetings of counsel among Class Plaintiffs for any appropriate purpose;
ii.     Coordinate with leadership for News Plaintiffs or other members of the MDL where appropriate;
iii.    Delegate and assign responsibility to Class Plaintiff counsel, including drafting or responding to motions;
iv.     Organize and direct Class Plaintiffs in effectuating discovery an efficient manner;
v.      Conduct settlement negotiations on behalf of the Class(es);
vi.     Designating which attorneys appear at hearings with the Court and at depositions on behalf of Class Plaintiffs;
vii.    Retain experts;
viii.   Approve all expenses by counsel for Class Plaintiffs;
ix.     Hire or negotiate for hiring all litigation vendors in coordination with other MDL counsel where appropriate;
x.      See that schedules are met;
xi.     At their discretion and at the appropriate juncture, appoint counsel responsible for ensuring a fair and equitable distribution of settlement funds among the class members.
xii.    Prepare and distribute periodic status reports to the parties.
xiii.   Maintain adequate files of all pretrial matters and make them available for examination by Class Plaintiffs or their attorney.
xiv.    Act as spokesperson for all Class Plaintiffs at pretrial proceedings and in response to any inquiries by the court, subject to the right of any Class Plaintiffs' counsel to present non-repetitive individual or different positions.
xv.     Enter into stipulations with News Plaintiffs and opposing counsel as necessary for the conduct of the litigation.
xvi.    Perform such other duties as may be incidental to proper coordination of Class Plaintiffs' pretrial activities or as authorized by further order of the court.
xvii.   Work collaboratively with the steering committee, which will assist leadership counsel in prosecuting the Class Cases, with each member performing work based on their areas of expertise as delegated by leadership counsel.
xviii.  Ensure that the leadership structure remains consistent regardless of whether new lawsuits are filed and centralized within this MDL, with new counsel not automatically joining the leadership group.

The steering committee for the Class Cases will assist the leadership counsel in prosecuting the Class Cases. Each will perform work based upon their areas of expertise as the leadership counsel delegates, with the advice and consultation of the steering committee.

## 5.      Communications with the Court and Non-Leadership Counsel

### a.      News Plaintiffs' Position

News Plaintiffs request monthly status conferences with Magistrate Judge Wang to address the parties' discovery disputes. In connection with such status conferences, News

Plaintiffs' Leadership Committee will prepare briefing and/or summaries of disputes for the Court and other News Plaintiffs. News Plaintiffs' Leadership Committee will also organize bi-monthly calls with all News Plaintiffs' counsel to report on and discuss developments in the case.

### b.    Class Plaintiffs' Position

Class Plaintiffs join the request for monthly status conferences. Given the good relations and strong lines of communication among all Plaintiffs' counsel, the Class Plaintiffs do not believe that additional formal processes for communicating with non-leadership counsel are required. As the case progresses, to the extent any non-leadership counsel feels that communications by leadership counsel are inadequate, such non-leadership counsel may, after first attempting to resolve the issue with leadership counsel, bring the matter to the Court's attention.

### 6.    Limits on Non-Leadership-Counsel Activity

### a.    News Plaintiffs' Position

None at this time.

However, going forward, News Plaintiffs' Liaison Counsel and Leadership Committee will remain the same regardless of whether any new lawsuits are filed by individual media companies and become centralized within this MDL. Counsel for any such media companies who file new lawsuits will not be part of News Plaintiffs' Leadership Committee.

### b.    Class Plaintiffs' Position

Class Plaintiffs do not propose any specific limits on activity by non-leadership counsel at this time. However, going forward, the Class leadership appointed by the Court pursuant to this submission will remain the same regardless of whether any new lawsuits are filed and become centralized within this MDL. Counsel who file new lawsuits will not be part of the leadership counsel of this MDL.

### 7. Compensation of Non-Leadership Counsel

#### a. News Plaintiffs' Position

News Plaintiffs have agreed that no compensation for News Plaintiffs' Leadership Committee is necessary. Relatedly, News Plaintiffs and Class Action Plaintiffs have agreed that any leadership counsel appointed for the Class Action Plaintiffs will not seek compensation from any News Plaintiff and vice versa.

#### b. Class Plaintiffs' Positions

News Plaintiffs and Class Action Plaintiffs have agreed that any leadership counsel appointed for the Class Cases will not seek compensation from any News Plaintiff and vice versa.

Class Plaintiffs do not believe that any order from the Court before the appointment of leadership counsel is necessary to address compensation of leadership or non-leadership counsel. The *Authors Guild* Plaintiffs may revisit this after the appointment.

### B. Defendants' Positions

Defendants sought and received multidistrict consolidation for these cases because the different Plaintiff groups, represented by different counsel, either refused to or could not get on the same page about discovery, the legal claims and theories they are pursuing, and overall case strategy. Defendants were constantly whipsawed among crushing, duplicative and competing discovery demands. With hundreds of depositions on the horizon, the parties have failed to reach agreement on a deposition protocol because Defendants had no interlocutors with authority to speak for Plaintiffs.

Now, nearly two months after these cases have been centralized, News Plaintiffs' and Class Plaintiffs' position is: change nothing. They propose having virtually every attorney involved on their side of the case receive a "Leader" badge. But when everyone is a "Leader" no one is a leader. Plaintiffs' proposed structure offers no efficiencies whatsoever and is a recipe for continued infighting and dysfunction. Indeed, Class Plaintiffs apparently are unable to agree whether "additional formal processes" for communicating among themselves is necessary. *See infra* Section II.A.5.b (stating that only "*Authors Guild* Plaintiffs do not believe that additional

processes for communicating with non-leadership counsel are required"). The history of these cases to date shows that what Plaintiffs propose simply will not work.

To be clear, Defendants do not oppose a separate leadership structure for the News Cases and Class Cases. (Plaintiffs' long recitation above about the need for separate leadership therefore was unnecessary.) To conserve resources and minimize duplication, however, the Court should ensure the leadership structure promotes efficiency. Plaintiffs' proposals do not do that because they do not empower any attorney to make decisions about (*e.g.*,) deposition protocols or other case-wide issues for any party other than its own client. Indeed, News Plaintiffs' position is that "each counsel may participate in all proceedings before the court as fully as such counsel deems necessary" and that "Liaison Counsel shall not have the right to bind any party as to any matter without the consent of counsel for that party, except Liaison Counsel's own clients." This is contrary to standard practice in multidistrict litigation, in which the transferee court is empowered to "institute procedures in which one or more attorneys are selected and authorized to act on behalf of counsel and their clients with respect to specified aspects of the litigation." Manual for Complex Litig. § 10.22. The Class Plaintiffs have not identified any leader at all.

Appointing a Lead Counsel with the authority to speak on behalf of each subgroup will promote efficiency in conducting discovery, reaching stipulations, and narrowing the issues for the Court. As the Manual for Complex Litigation recognizes, "committees of counsel can sometimes lead to substantially increased costs" and "duplication of efforts." Manual Complex Lit. § 10.221; *see also* Bolch Judicial Institute, Duke Law School, Guidelines and Best Practices for Large and Mass Tort MDLs at 30 (2d ed. 2018) ("[A] fairly simple structure, consisting of a lead counsel and a liaison counsel, is all that is required . . . [for] actions in which the plaintiffs generally assert the same or similar claims."). If the Court disagrees and allows Class Plaintiffs' and News Plaintiffs' baroque leadership structure, Defendants request that the Court at least order Plaintiffs to take coordinated steps necessary to develop an orderly pretrial process. The absence of coordination among Plaintiffs–even after the JPML issued its order on April 3–only underscores

the need for firm guidance from this Court.[18]

There is much work to be done.  This Case Management Statement confirms that Plaintiffs and Defendants agree on a key procedural step: the Court should order a <u>single</u> pre-trial schedule across <u>all</u> cases in this MDL leading to a <u>single</u> date to file dispositive motions.  But Plaintiffs' proposed schedule is unrealistic even with the cases' current scope and would become wildly unrealistic if the Court grants Plaintiffs' pending and anticipated requests to drastically expand the scope of the cases.  The Court cannot make an informed decision to set a dispositive motion filing date without knowing the scope of the claims being litigated, the products at issue, or the proposed class definition.  Nothing in Class Plaintiffs' or News Plaintiffs' position statements above suggest they are any closer to reaching agreement among themselves on these issues, which is a prerequisite to the motion practice the Court ultimately will need to resolve regarding Plaintiffs' attempts to add claims or broaden the scope of the products at issue.

For these reasons, Defendants urge the Court to order appointment of a <u>single</u> Interim Class Counsel pursuant to Rule 23(g).  If Class Counsel cannot agree on the identity of that Interim Class Counsel, the Court should direct the prompt submission of competing proposals from which the Court can choose.  Once the Court appoints Interim Class Counsel, that counsel should seek leave to file a Proposed Consolidated Class Action Complaint to supersede the existing complaints.  For the reasons explained in OpenAI's and Microsoft's oppositions to Plaintiffs' separate (uncoordinated and very different) motions for leave to amend (*AG* Dkts. 407, 409; *Tremblay* Dkt. 403), and as discussed above, Defendants believe that the Court should not permit Plaintiffs to add new causes of action, add additional later-released products to the case, or expand their class definition in the superseding pleading outside the scope of the current separate complaints.  However, to the extent Plaintiffs seek to do so in a Proposed Consolidated Class Complaint, the

---

[18] Since the April 3 Transfer Order, various Plaintiffs groups have issued dozens of subpoenas to former OpenAI employees—including 24 separate subpoenas for deposition to 13 former OpenAI and Microsoft employees.  None of those appear to have been properly coordinated among Plaintiffs; indeed, some former OpenAI employees have been the target of as many as 6 different deposition subpoenas.

Court may resolve those issues following briefing on a noticed motion.

Once the scope of claims is set, by agreement or by the Court's decision, News Plaintiffs and Class Plaintiffs each should serve one coordinated set of discovery requests. As discussed below, there is no need for this Court to alter default rules regarding the number of interrogatories or timing of contention interrogatories; any such requests to depart from default local rules regarding the number or timing of interrogatories should be directed to Magistrate Judge Wang).

Judge Wang also should enter a deposition protocol, either stipulated by the Parties or resolved by the Court after appropriate briefing. The protocol should ensure that each individual witness sits for a single, coordinated deposition attended or represented by any party seeking to question the witness. *See infra* Sections IV.C, V.C.

## III.    BRIEF STATEMENT OF THE NATURE OF EACH ACTION

### A.    Case Information

*See* attached Exhibit A.

### B.    Resolved Motions and Pending Motions & Discovery Disputes

*See* attached Exhibit B.

## IV.    CONSOLIDATION

### A.    Class Plaintiffs' Position

#### 1.    General Principles and Approach

Class Plaintiffs propose a single consolidated class complaint for their copyright claims. The consolidated copyright complaint (CCC) will thus assert claims of direct, contributory, and vicarious infringement against OpenAI and Microsoft on behalf of the class, thus consolidating the overlapping class copyright claims asserted in the *Tremblay* and *Authors Guild* actions to "streamline the litigation" and "facilitate efficient motion practice." Manual for Complex Litig. § 21.15 (4th ed.), *Managing Related Proposed Class Actions in Multidistrict Litigation*, Federal Judicial Center (2018). "Consolidated complaints can be critical case management tools" which enable "the parties to conduct discovery more efficiently and

provid[e] an effective vehicle for motion practice with respect to common issues of law and fact." *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MC-2543, 2015 WL 3619584, at *1 (S.D.N.Y. June 10, 2015). For this reason, consolidated class complaints streamlining previously overlapping claims are standard and recommended practice in MDL proceedings. *See* Manual for Complex Litig. § 21.15 (4th ed.) ("A common practice in consolidated multiple cases, including class actions, is to encourage use of a master pleading"). The Consolidated Copyright Complaint would, to be clear, become the operative complaint for the copyright claims. The Consolidated Copyright Complaint, however, should not and is not intended to serve as a waiver of any Class Plaintiffs' right to have their cases transferred back to their original forum at the conclusion of coordinated pre-trial proceedings under *Lexecon Inc. v. Milberg Weiss Bershand Hynes & Lerach*, 523 U.S. 26 (1998).

With respect to any additional claims (see below), Class Plaintiffs currently take no position as to whether those should be in this same complaint or another. Either approach—two complaints or one—will ensure non-duplication, and both approaches are consonant with MDL principles of efficiency and administrative convenience. Two separate class complaints would provide an efficient path to integrating the two class actions, while also providing Defendants a discrete set of allegations supporting the non-copyright claims. Separate complaints are not at all uncommon in MDLs. *See, e.g.*, *In re: Generic Pharms. Pricing Antitrust Litig.*, MDL No. 2724 (E.D. Pa.).

In any event, nothing about the remaining discovery or case schedule need depend on the Court's decision on these issues, and on whether non-copyright claims are in a separate complaint (with certain overlapping absent class members, but not overlapping *claims*).

### 2.    Claims that may be brought

Defendants request that the Court limit the claims that may be brought in any consolidated complaint. The Court should reject that request, and should instead order that such

complaints may include any plaintiffs, defendants, claims, products, or models identified in any of the operative or proposed amended complaints in the *Authors Guild* and *Tremblay* actions.

As Defendants do not appear to dispute, the scope of any consolidated complaint cannot be cabined at this stage. By way of background, Magistrate Judge Wang set a deadline of April 15, 2025 for *Authors Guild* Plaintiffs to amend their complaint. On April 11, comfortably within that time, *Authors Guild* Plaintiffs moved for leave to amend. That motion is not yet fully submitted, as this Court issued its order staying all deadlines before Plaintiffs' reply brief came due. *Authors Guild* Plaintiffs respectfully submit that the Court should not deny them the opportunity to bring the claims sought by their amended complaint before Plaintiffs have an opportunity to reply. *Tremblay* Plaintiffs also have a pending motion for leave to amend. For the reasons explained below, more fully set forth in Class Plaintiffs' motions to amend, and to be supplemented in their reply, Class Plaintiffs were entitled to bring the claims in their proposed amended complaints. They are therefore entitled to bring those claims—or indeed any claims permitted by Rule 15(a)(2)—in any consolidated amended complaint they may file.

In brief: Rule 15(a)(2) governs amendments within the time set by a scheduling order. *Sacerdote v. New York Univ.*, 9 F.4th 95, 115 (2d Cir. 2021). Under that rule, "[t]he court should freely give leave when justice so requires," "a liberal and permissive standard." *Id.* Defendants' opposition failed to cite Rule 15 even once—because they cannot refute that that standard is met. The motion was timely, Defendants have not argued bad faith or futility, and they would not be prejudiced. Defendants' suggestion that the amendments would "significantly expand the scope of the case and prolong discovery" is incorrect. Many of the changes are squarely covered by existing discovery as ordered by Magistrate Judge Wang. *See* Dkt. 293 (discovery encompasses models in OpenAI's interrogatory response). In any event, these amendments are the product of information revealed in discovery about additional models and conduct by Microsoft and OpenAI. Even if the amendments would require some additional discovery, that "does not render an amended complaint unduly prejudicial" under Rule 15(a)(2). *Dass v. City Univ. of New York*, No. 18-cv-11325, 2024 WL 4986914, at *5 (S.D.N.Y. Dec. 5, 2024); *see also U.S. For & on*

*Behalf of Mar. Admin. v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*, 889 F.2d 1248, 1255 (2d Cir. 1989); *State Tchrs. Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981). *Authors Guild* Plaintiffs' additional claims were permissible under their proposed amendments, and should be allowed to be brought in any consolidated complaint.

The same is true for the *Tremblay* Plaintiffs. On March 4, 2025, the *Tremblay* Plaintiffs moved for leave to amend to file a proposed Second Amended Complaint that included direct and vicarious copyright claims; state law claims including violations of the California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 et seq.) and California Comprehensive Data Access and Fraud Act claims; and federal claims under the Digital Millennium Copyright Act (17 U.S.C. § 1201), the Computer Fraud and Abuse Act (18 U.S.C. § 1030), and the Sherman Act (15 U.S.C. § 1), individually and on behalf of registered and unregistered authors of books and other works. *Tremblay* Plaintiffs also added Microsoft as a defendant. *Tremblay* Plaintiffs' motion for leave to amend was fully briefed and set for hearing on April 10, 2025 when the JPML issued its transfer order on April 8, 2025. The *Tremblay* Plaintiffs' additional claims and proposed amendments are properly brought under Rule 15, and *Tremblay* Plaintiffs should be permitted to pursue them, either in a consolidated or separate complaint. Nothing about the consolidation of these cases into an MDL changes that. Indeed, an MDL transferee court might oversee (for example) an economic loss class complaint alongside a medical monitoring class complaint for largely the same absent class members; it might oversee parties bringing similar claims under different laws, such as antitrust claims on behalf of direct and indirect purchasers asserting claims under federal and state law respectively; or it might oversee complaints brought by different entities such as private plaintiffs and governmental entities, each in their own complaints bringing various federal and state law claims. *E.g.*, *In re: Social Media Adolescent Addiction/Personal Inj. Prods. Liab. Litig.*, MDL No. 3047 (N.D. Cal.). *Tremblay* Plaintiffs also note that discovery is far from complete. Defendants have not substantially completed document production and indeed, seek to delay productions further. Also, deposition discovery is just beginning. Plaintiffs anticipate that further discovery will further support Plaintiffs' proposed

amendments. The Court should reject Defendants' attempt to restrict the claims brought in the *Authors Guild* and *Tremblay* actions.

### 3.    Next Steps

As noted above, rather than pre-emptively cabin the complaint, the Court should order that any consolidated complaints may include any plaintiffs, defendants, claims, products, or models identified in any of the operative or proposed amended complaints in the *Authors Guild* and *Tremblay* actions. These consolidated complaints will moot the motions to amend in both the *Authors Guild* and *Tremblay* actions.

In the alternative, to the extent the Court is unwilling, on the current papers, to issue such an order, and wishes to evaluate the contents of the proposed complaints more particularly, Plaintiffs agree with Defendants that the parties should brief the issue by reference to a proposed amended consolidated complaint. Class Plaintiffs would in that case request that the Court order: (a) Class Plaintiffs serve proposed consolidated complaints on Defendants on or before June 10, 2025; (b) if Defendants do not consent to Class Plaintiffs' filing the consolidated complaint(s) by June 17, 2025, the Class Plaintiffs will file a motion for leave to file the consolidated complaint(s) by that date; (c) Defendants to file a memorandum in opposition 10 days thereafter; and (d) Class Plaintiffs to file a reply 5 days after the opposition. This briefing schedule is generous given the already extensive briefing on this issue.

Nothing about the remaining discovery or case schedule need depend on the Court's decision on these issues.

### B.    News Plaintiffs' Position

For the News Cases, the News Plaintiffs agree with Defendants that consolidated pleadings are unnecessary. There is thus zero reason to further extend discovery or the case schedule for this reason.

Moreover, while the News Plaintiffs trust the issue of consolidated class complaints will be addressed expeditiously, to the extent that is not the case, the News Plaintiffs note that any

delay on the class side should not further extend discovery or the case schedule as to the News Plaintiffs.

## C.    Defendants' Position

Class Plaintiffs' proposal is incomprehensible. They do not say whether they plan to file one Consolidated Amended Class Action Complaint, two, or some larger number. They do not say what claims they intend to assert. Even worse, Class Plaintiffs request a preemptive order from this Court allowing them to file "any consolidated complaints" and "any proposed separate complaint," without even submitting their proposed complaints to Defendants or the Court for consideration, let alone briefing. As reflected in the *Authors Guild* and *Tremblay* Plaintiffs' pending motions for leave to amend their respective current complaints, counsel in those two cases have proposed divergent and incompatible strategies. There appears still to be no agreement among the various Class Counsel and, disturbingly, they assert a non-existent "right" to have class action cases subdivided again later after this Court has consolidated them. Class Plaintiffs now propose submitting up to three separate complaints: a proposed "single consolidated class complaint" including "copyright claims," plus "two complaints or one" addressing "additional" unspecified claims. Class Plaintiffs' proposal is impracticable.

Defendants submit that Class Counsel must harmonize their positions and propose a workable Interim Class Counsel structure under Rule 23(g)(3). If they cannot, the Court should require them to submit competing proposals which the Court can resolve. Once the Court appoints Interim Class Counsel, the Court should direct that counsel to file a single "consolidated complaint that amends existing complaints" and "serve[s] as the vehicle for defining the proposed class and deciding class certification." Manual for Complex Litig. § 21.25. Where multiple federal class cases are consolidated in an MDL, "the transferee judge can order consolidated pleadings and motions to decide how to resolve competing claims for certification." *Id.* The parties then can ascertain whether a stipulation for filing can be reached or whether motion practice will be necessary to address the proposed scope of the case in the

consolidated class pleading, or any other complaint(s) Class Plaintiffs propose to file.  Once the scope of claims is set, discovery can be driven in an efficient and cooperative manner toward making those claims ripe for summary judgment.

For the reasons explained in OpenAI's and Microsoft's oppositions to Class Plaintiffs' separate motions for leave to amend (*AG* Dkts. 407, 409; *Tremblay* Dkt. 403), Defendants believe that the Court should not permit Plaintiffs to add new causes of action, add additional later-released products to the case, or expand their class definition in the superseding pleading outside the scope of the current separate complaints.  However, to the extent Plaintiffs seek to do so in a Proposed Consolidated Class Complaint over Defendants' objections, the Court may resolve those issues following briefing on a noticed motion.  Plaintiffs' suggestion that "[n]othing about the remaining discovery or case schedule need depend on" the scope of their Proposed Consolidated Class Complaint is categorically false.  Any expansion of the claims, products at issue, factual allegations, or class definition would require further rounds of Rule 12 motion practice and substantial additional discovery, which would also necessarily extend the case schedule further.

Because the pleadings are largely settled in the consolidated *New York Times* and *Intercept* non-class matters, those cases should retain their existing separate pleadings.  If, and to the extent that, the plaintiffs in these cases are part of the putative classes pleaded in the Consolidated Amended Complaint in the class cases, the Court should find that these plaintiffs have preemptively opted out of the putative classes.  *Petryazhna* (formerly *Millette*) should also retain its existing separate pleading, including because Plaintiff in that case has requested that her "case be stayed pending class certification and/or summary judgment in the other class actions subject to the JPML's order." *AG*, Dkt. 400 at 1, n.2.[19]

---

[19] The Parties have conferred and agreed that Petryazhna's claims should be stayed pending class certification and/or summary judgment in the other class actions subject to the JPML's order so long as Petryazhna's claims are stayed in their entirety.

## V.    CASE SCHEDULING

### A.    Scheduling

#### 1.    Plaintiffs' Proposal

Plaintiffs propose the schedule below. This schedule takes into consideration all claims currently asserted or proposed to be asserted in the proposed amended complaints in all dockets. Plaintiffs agree the most efficient resolution of this case for all involved necessitates firm deadlines, set in advance, that all sides understand the Court will not move absent agreement and/or good cause.

| Event | Date or Deadline |
|---|---|
| Submission of an agreement on a proposed Class leadership structure or of applications for Class leadership, as applicable, as well liaison and leadership structure for the News Cases | May 16, 2025 |
| Appointment of Class Plaintiffs and News Plaintiffs' Liaison & Leadership Counsel | May 22, 2025 or at the Court's convenience thereafter |
| First day to serve contention interrogatories | May 28, 2025 |
| Last day to file stipulated or opposed discovery protocols and letter briefs in support, if applicable[20] | June 5, 2025 |
| Last day to Serve or File Consolidated Class Action Complaint(s) | June 10, 2025[21] |
| Substantial completion of document productions for requests issued prior to 5/22/2025 | June 24, 2025 |

---

[20] Those protocols will include a deposition protocol, a protective order, and a training data inspection protocol. They may include an ESI protocol and/or a source code protocol.

[21] News Plaintiffs are amenable to class certification occurring prior to or concurrently with summary judgment briefing. However, News Plaintiffs take no position on the date by which Class Plaintiffs should serve any amended complaints other than to say that to the extent this process is delayed such delay should not further extend discovery or delay the case schedule as to the News Cases.

| Event | Date or Deadline |
|---|---|
| Last day to serve additional written discovery or propound additional custodians/search terms (absent good cause) | July 29, 2025 |
| Motion for Class Certification | September 10, 2025 |
| Opposition to Motion for Class Certification | October 8, 2025 |
| Class Certification Reply | October 22, 2025 |
| Hearing on Motion for Class Certification | November 7, 2025 |
| Close of fact discovery | November 21, 2025 |
| Expert Reports on issues on which a party has the burden of proof | December 19, 2025 |
| Rebuttal Expert Reports | January 30, 2026 |
| Motions for Summary Judgment[22] | March 6, 2026 |
| Close of expert discovery | March 12, 2026 |
| *Daubert* motions | March 19, 2026 |
| Oppositions to Motions for Summary Judgment and to *Daubert* motions | April 3, 2026 |
| Replies in support of Summary Judgment motions | April 24, 2026 |
| Hearing on Motions for Summary Judgment | May 19, 2026 |
| Motions *in limine* for matters to be tried before this Court | June 9, 2026 |
| Ready trial date for matters to be tried before this Court | August 10, 2026 |

Plaintiffs' proposed schedule provides ample time for the parties to complete discovery and present the issues to the Court while still ensuring a prompt resolution of the action.

---

[22] News Plaintiffs respectfully request that any delay in the briefing and decision of class certification not affect the summary judgment schedule in the News Cases.

The parties agree on several aspects of the schedule. *First*, they agree on the importance of appointing leadership counsel as soon as possible. To that end, Class Plaintiffs have since the JPML's April 3rd order been working to agree on a proposed leadership structure for this MDL. Class Plaintiffs are submitting concurrently with this filing their proposal for leadership. All Class Plaintiffs agree that it is in the best interest of the named and unnamed plaintiffs that the Court appoint leadership counsel as soon as possible, including at the May 22, 2025, conference if feasible. Meanwhile, the News Plaintiffs have agreed to a Liaison and Leadership Structure and ask the Court to make those appointments at the May 22, 2025, conference or as soon thereafter as practicable. *Second*, the parties agree that, given the extensive discovery to date, "any further written discovery from Plaintiffs" is likely to be "limited." While Defendants have thus far not so committed, Plaintiffs anticipate the same is true of Defendants who, by way of example, have already served 559 RFPS on the NYT alone and over 200 RFPS on SDNY Class Plaintiffs alone.

In other key respects, however, the parties diverge. Plaintiffs' positions with respect to those differences are as follows.

***The schedule should bring discovery to a rapid close.*** Defendants waited until the parties were well into discovery to seek a JPML. As such, these cases have been pending for over a year and half. Several completion, substantial completion, and interim completion deadlines have come and gone. By the time of *Plaintiffs'* proposed close of discovery, it will have been over two years since the cases were commenced. And, by the time of *Defendants'* proposed close of discovery, more than three years will have passed since the cases were commenced. In that time, as Defendants themselves note, Plaintiffs have issued 400 RFPs and Defendants have produced two million pages. Many of those RFPs were served over a year ago. Nor have Defendants been slow in seeking discovery from Plaintiffs. In The New York Times case alone, Defendants have served 559 RFPs, 46 Interrogatories, and 147 RFAs, including over 200 RFPs since the January 21, 2025, conference—despite the Defendants' statements at the hearing in December that written discovery requests come to an end. *See* Dec. 3, 2024 Hearing Tr. at 151:18–152:1.

41

Likewise, in the SDNY Class Plaintiffs case, Defendants have collectively served more than 200 RFPs and almost 50 Interrogatories to each Plaintiff, and OpenAI has served 66 RFAs. The parties have moreover filed dozens of discovery motions and this Court (and others) has already overseen hours of discovery conferences. That is not to say that Defendants' work is done. Far from it. For example, the *Tremblay* Plaintiffs have issued new RFPs and other written discovery which OpenAI has failed to meaningfully respond to. All Plaintiffs are also continuing to inspect data and source code, with some key data yet to be made available or, where necessary, produced. But the point is that this consolidation need not trigger a restarting of the clock. Rather, the Court should set a schedule that allows for any open issues to be resolved, while recognizing all the work the parties and Courts have already done to date.

Consistent with that extended discovery period, most Plaintiffs have *already* substantially completed productions and expect to complete their productions by early June—long before the deadlines contemplated by the Plaintiffs' proposed schedule.

If, by contrast, Defendants have failed to bring their discovery close to completion, that failure is entirely their own. Focusing on just the time since the JPML issued its order, discovery has ground to a halt—despite this Court's clear instructions to the contrary. *See* Dkt. 74 ("This stay of discovery deadlines should not be construed as a stay of conducting discovery."). For example, on document productions: neither The Times, nor the Daily News Plaintiffs, nor *Authors Guild* Class Plaintiffs have received a non-overlay production from OpenAI since April 1, six weeks ago. Except for print requests and plaintiff-specific training data, the same is true of N.D. Cal. Class Plaintiffs, CIR, and Intercept. On meets and confers: OpenAI has ignored emails requesting meet and confers or refused to provide timely dates. Defendants should not be rewarded for those delays with a further extension of the schedule.

Still, there is not much discovery left to go. As explained above, any amended complaints will not significantly expand document discovery, and depositions can be completed in the time described. Even despite the deficiencies in Defendants' productions, Plaintiffs are ready, willing and able to start taking depositions tomorrow, and given the number of lawyers on both sides of

the "v," it is more than reasonable to complete those depositions over the subsequent four months. Indeed, despite Defendants' complaint that "Plaintiffs have collectively sought over 100 depositions," it was their request to proceed via a MDL. And, between the various defense firms representing OpenAI and Microsoft, they have more than 50 attorneys who have appeared in these cases. Accordingly, Defendants have more than enough resources to complete these depositions in a timely manner, as do Plaintiffs.

Finally, it is worth nothing that these cases should be moved forward expeditiously as they involve matters of significant public concern that require prompt resolution. Defendants' products are evolving at a breakneck pace, which imperils the marketplace for Plaintiffs' works. As Judge Chabria recently noted, "[i]f an AI company is downloading and copying news articles, copyrighted news articles, without permission *en masse*, that seems very likely to lead to the creation of a product that will have the capability of and likely will produce an infinite amount of content that will diminish demand for the copyrighted works that were used to feed the model." Hearing Tr. at 10:2–8, No. 23-cv-03417. Accordingly, it is "not inconceivable that the market for the copyrighted works that were fed into the market could be eliminated entirely." *Id.* at 10:9–11. Accordingly, Plaintiffs request the Court set firm deadlines that are not moved absent agreement or good cause.

**Damages should not be bifurcated.** Tellingly, the request to bifurcate is made only by Microsoft and is not joined by OpenAI. Bifurcation should be denied, for three reasons: (1) discovery into Defendants' illicit profits is relevant not only to damages but also to the merits of Plaintiffs' claims, (2) bifurcation would generate significant and wasteful expense and delay, and (3) this discovery is minimally burdensome.

*First,* discovery into Defendants' profits is highly relevant to the merits of Plaintiffs' claims. *See Marchese v. Milestone Sys., Inc.*, 2013 WL 12183618, at *3 (E.D. Mich. Dec. 3, 2013) (denying motion to bifurcate damages discovery where evidence of damages was relevant to liability). Microsoft does not even dispute this. Nor could they, given how extensively profits feature in the liability analysis. Profits are relevant to fair use factor one, commercialization:

"The greater the private economic rewards reaped by the secondary user (to the exclusion of broader public benefits), the more likely the first factor will favor the copyright holder and the less likely the use will be considered fair." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994). They are relevant to the balancing the Court must conduct of the "private economic rewards" that Defendants have "reaped"—and expect to continue reaping—against the alleged "public benefits" that Defendants repeatedly trumpet. *E.g.*, *Times* Dkt. 65 at 2. They are relevant to willfulness: "profitability of the accused product is likely relevant to the determination of willful infringement, as greater profitability translates into a possible financial motive for knowingly infringing." *Distributors, LLC v. London Luxury*, 2010 WL 4008193, at *5 (N.D. Ill. Oct. 13, 2010). And they are relevant to rebutting OpenAI's public claims that it simply *cannot* pay to license the copyrighted content on which they trained their models.[23] Discovery into Defendants' current and expected profits will reveal their true ability to pay for the copyrighted content that make their products work.

*Second,* for that reason, Microsoft's bifurcation proposal would result in significant and wasteful expense and delay. Because damages are relevant to the merits, the parties will need discovery into Defendants' profits immediately, even if bifurcated. In light of that, it would be wasteful to shoehorn damages and damages experts into a second round of reports and depositions. The better approach is to complete fact discovery during fact discovery, including to ensure these highly important cases are resolved as quickly as possible.

*Third,* it would be only minimally burdensome to provide this discovery. Microsoft contends that it would be "exceedingly burdensome," but provides no basis for that contention. To the contrary, documents like "product-line financials" are easy documents to locate and produce. *See SenoRx, Inc. v. Hologic, Inc.*, 920 F. Supp. 2d 565, 569 (D. Del. 2013) (denying

---

[23] OpenAI Ltr. to Faisal D'Souza, Office of Science and Technology Policy (Mar. 13, 2025), at 4, https://cdn.openai.com/global-affairs/ostp-rfi/ec680b75-d539-4653-b297-8bcf6e5f7686/openai-response-ostp-nsf-rfi-notice-request-for-information-on-the-development-of-an-artificial-intelligence-ai-action-plan.pdf?ref=platformer.news.

bifurcation of damages because the defendant "does not articulate with specificity why this inquiry is likely to be any more onerous than in the typical patent case"). Tellingly, when Plaintiffs moved to compel additional information about Defendants' profits, neither Microsoft nor OpenAI argued that it would be burdensome to collect and produce financials. *Times* Dkt. 507; *Authors Guild* Dkt. 374. Moreover, both Microsoft and OpenAI have served document requests seeking financial information from Plaintiffs, including documents about lost profits. *E.g.*, Microsoft RFP 160 to The Times.

**Class certification briefing should occur before summary judgment briefing, or at a minimum, concurrently therewith.**[24] Under Rule 23(c)(1)(A), the court must determine whether to certify a class "[a]t an early practicable time." In this case, that time is *before* summary judgment. By October 2025, when Plaintiffs propose that briefing on class certification conclude, this case will have been pending for *two and a half years*. The extended duration of the case demands that the certification be briefed promptly after the close of discovery, to ensure that Rule 23's mandate that class certification be briefed "early" is satisfied.

Consistent with that directive, class certification before summary judgment is the order the *Tremblay* court adopted, over OpenAI's repeated and unsuccessful efforts. *Tremblay* Dkt. 51; 56; Nov. 26, 2024 Tr. at 24. Likewise, in a similar book copyright training class action against competitor LLM company Anthropic, Judge Alsup adopted a similar approach to the one Class Plaintiffs advocate here, with near-simultaneous briefing—hearing argument on class certification occurring *before* summary judgment. *Bartz et al. v. Anthropic PBC*, N.D. Cal. 3:24-cv-05417, Dkt, 95, 182. (N.D. Cal. 2025).

---

[24] News Plaintiffs take no position on the sequence of class certification and summary judgment briefing in the Class Cases. That said, News Plaintiffs do not agree that summary judgment briefing in the News Cases should trail class certification briefing or decision. Specifically, the resolution of the class certification issue in the Class Cases has no bearing on the resolution of the News Cases. As such, the Court would essentially be staying the News Cases pending its resolution of the class certification issue—which would needlessly delay the News Cases and in so doing impose significant costs on News Plaintiffs. Accordingly, News Plaintiffs respectfully submit that any delay in the briefing and decision of class certification not affect summary judgment in the News Cases.

Those courts were following the "traditional route" in class action cases in the Second Circuit and elsewhere. *Kurtz v. Kimberly-Clark Corporation*, 321 F.R.D. 482, 507 (E.D.N.Y. 2017); *see also Cuzco v. Orion Builders, Inc.*, 262 F.R.D. 325, 335 (S.D.N.Y. 2009) ("A court's decision on the merits, however, should ordinarily not occur before or simultaneous with a decision on class certification."); *Philip Morris Inc. v. National Asbestos Workers Medical Fund* 214 F.3d 132, 135 (2d Cir. 2000) ("[I]t is difficult to imagine cases in which it is appropriate to defer class certification until after decision on the merits."). MDL courts have followed suit. *See e.g.*, *In re Zurn Pex Plumbing Prods. Liab. Litig.*, No. 08-1958, 2009 WL 1606653, at *1 (D. Minn. June 5, 2009) (directing the parties to "focus first on the issue of class certification.").

It is the traditional route for good reason. That sequencing promotes judicial efficiency through several mechanisms. It avoids the prospect of one-way intervention, ensuring that class members benefit from or are bound by the Court's decision, as the case may be. *See, e.g.*, *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 547, 94 S. Ct. 756, 763, 38 L. Ed. 2d 713 (1974) (class certification should occur before summary judgment to "assure that members of the class would be identified before trial on the merits and would be bound by all subsequent orders and judgments."). It "give[s] clear definition to the action," so the parties can understand, in briefing summary judgment and trying the case, who is in fact a party thereto. Fed. R. Civ. P. 23(c)(1), Notes of Decision. It ensures that the merits are litigated sequentially, with trial on the heels of summary judgment. And in this case, class certification can be easily resolved. The basis for all Class Plaintiffs is that Defendants (i) acquired Class Plaintiffs' works by scraping them from notorious online "shadow libraries" such as LibGen and Common Crawl without obtaining a license and without compensation; and (ii) reproduced those books to train Defendants' large language models—a common course of conduct that yields common questions of law and fact. *See, e.g.*, *In re Napster, Inc. Copyright Litig.*, No. 3:00-md-1369, 2005 WL 1287611, at *12 (N.D. Cal. June 1, 2005) (class certified where common course of conduct infringed a large group of copyrights); *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 13-cv-5693, 2015 WL 4776932, at *17 (C.D. Cal. May 27, 2015) (same).

Defendants attempt to justify deviating from the traditional sequence by pointing to the Court's previous order to that effect. But that order was pursuant to a *stipulation* between S.D.N.Y. Class Plaintiffs and Defendants, under which Defendants agreed to an expedited discovery schedule and that they would not seek to transfer these cases (including under 28 U.S.C. § 1407) except under certain circumstances. Defendants violated that stipulation by seeking MDL centralization when those circumstances were not met. Despite that, and without denying that Defendants were in violation of the stipulation, the panel granted consolidation. In light of that, the stipulation is no longer effective, was never binding on N.D. Cal. Class Plaintiffs, and provides no basis for this Court to proceed with summary judgment before class certification.

Nor have Defendants provided any other reason to deviate from the standard procedure. They appeal to cases like *Authors Guild, Inc. v. Google Inc.*, 721 F.3d 132 (2d Cir. 2013), but nothing in that case created any rule about staging summary judgment before class certification. Of course, in other AI book copyright LLM training class actions, including *Tremblay* and *Anthropic* matters, courts adopted the opposite procedure. If mooting class certification was enough to hold summary judgment first, "defendants could almost always—if not always—seek abeyance of class proceedings pending resolution of motions against individual plaintiffs." *Indergit v. Rite Aid Corp*, 52 F.Supp.3d 522, 526 (S.D.N.Y. 2014). That reading of *Authors Guild v. Google* is impermissibly broad and the Court should reject it. Class certification here will be straightforward and should be briefed prior to—and certainly no later than—summary judgment. To the extent Defendants suggest that the sequencing of class certification is infeasible because it would occur before expert discovery, that does not pose a problem. To the extent any issues relating to class certification require expert testimony, those can be supported through declarations, as is routine in class-action cases. *E.g.*, *In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 449-50 (D. Kansas) (citing *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153 (3d Cir. 2002)).

***Reply expert reports are not needed***. Rule 26 does not contemplate reply reports, only opening and response reports, because that is enough to allow the parties to make their affirmative arguments, and respond to one another. Here, the parties will have that opportunity. Given the number of expert reports that may be filed in this matter, reply briefs would expand the record without significantly increasing informativeness. Moreover, by that point, these cases will have been going on for over two years. Reply reports would only serve to further prolong the matter. Courts in this district have regularly denied reply expert reports for those very reasons. *See Sandata Techs., Inc. v. Infocrossing, Inc.*, No. 05-cv-09546, 2007 WL 4157163 (S.D.N.Y. Nov. 16, 2007) ("[T]he expert schedule set by the Court did not contemplate reply expert reports; indeed, the Court explicitly prohibited them. Therefore, each party was required to submit a report on the issues on which it bears the burden of proof, and the opposing party was given an opportunity to submit a rebuttal."). If the parties have good cause for a reply reports, they may move the Court for leave.

***A second technology tutorial is not needed.*** At this Court's request, on January 14, 2025, News Plaintiffs and Defendants conducted a technology tutorial for the Court in connection with the briefing on the motion to dismiss. *See* Dkt. 433 at 5:5–6 ("The Court: All right. What about a presentation on how these things work?"). Defendants responded by indicating they were ready to provide such a tutorial and agreed to the approach. *Id.* 5:10–11 ("The defendants think a brief discussion tutorial about the technology would be appropriate."); *see generally* 5:24–17:9. Again, the purpose of the MDL was not to start these cases from scratch. Or allow either side a do-over of matters that have already been handled. Accordingly, neither News nor Class Plaintiffs feel that another technology tutorial is necessary, and do not recommend adding another item to the Court's and parties' busy schedule unless it would be helpful to the Court.

All Plaintiffs are, of course, willing to provide the Court with an additional technology tutorial if the Court requests. If the Court does request another tutorial, Plaintiffs agree with Defendants that the date for the tutorial should not interfere with the existing case and discovery schedule.

***Issues relating to Ziff Davis.*** As indicated below, Ziff Davis is working to get up to speed as quickly as possible. To that end, it respectfully requests that the following two things be ordered at the May 22, 2025 conference, or as soon thereafter as practicable: (1) that Defendants immediately provide Ziff Davis with all discovery previously provided to other News Plaintiffs and (2) that discovery be deemed open in the Ziff Davis case.

## 2. Defendants' Proposal

Defendants propose the schedule below. The proposal is based on the claims, products, and class definitions currently asserted in the operative pleadings in the pending cases. Defendants maintain that no new claims or products should be added to these cases at this juncture, nor should the class definitions in the pending cases be expanded. *See, e.g.*, *Tremblay*, Dkt. 403; *AG*, Dkt. 407, 409. To the extent new or additional claims, products, or class definitions are permitted, these proposed deadlines would need to be revisited as the parties will be required to conduct significant new document discovery which cannot be accomplished within the time frames proposed below.

Both Plaintiffs' proposed schedule and Defendants' proposed schedule appropriately set a single date to complete discovery and a single deadline for dispositive motions. This of course makes good sense since a primary purpose of the MDL is to coordinate discovery among the parties to efficiently drive towards efficient resolution of the matters. Given the discovery the parties will need to take (plaintiffs have proposed taking well more than 100 depositions), Defendants' proposal is an aggressive, but reasonable approach.

| Event | Deadline |
|---|---|
| Appointment of plaintiffs' Leadership Counsel | As soon as practicable following the initial conference |
| Technology Tutorial | At Court's availability after appointment of Leadership Counsel |
| Last day to file stipulated or opposed discovery protocols | 30 days after appointment of Leadership Counsel |

| Event | Deadline |
|---|---|
| Last day to serve Proposed Consolidated, Superseding Class Action Complaint (CCAC)[25] | 30 days after appointment of Leadership Counsel |
| Last day to serve additional written discovery | 30 days after CCAC filing |
| Substantial completion of document productions | 60 days after last day to serve written discovery |
| Last day to respond to contention interrogatories | 60 days before close of fact discovery |
| Close of fact discovery | 270 days after substantial completion of document productions |
| Close of expert discovery (includes opening, rebuttal, reply, and surreply expert reports)<br><br>For clarity, the parties agree that Opening Reports shall be submitted based on which party bears the burden of proof as to a particular issue.  Rebuttal reports shall be submitted in response, followed by Reply reports.<br><br>With respect to damages, Microsoft seeks bifurcation as described below.  If discovery concerning damages is bifurcated, then Microsoft proposes three rounds of expert reports—opening, rebuttal, and reply.  If discovery concerning damages is not bifurcated, then Microsoft proposes that:  (1) Plaintiffs will submit Opening Reports, (2) Defendants will submit Rebuttal Reports, which will include apportionment, (3) Plaintiffs will submit Reply Reports including a rebuttal as to apportionment, and (4) Defendants will submit Surreply Reports to respond to any rebuttal issues raised by Plaintiffs as to apportionment. | 120 days after close of fact discovery |
| Dispositive motions and Dauberts (all cases) | 30 days after close of expert discovery |

---

[25] As noted above, Defendants maintain that Plaintiffs should not be permitted to plead additional claims, add new products, or expand the class definition.

| Event | Deadline |
|---|---|
| Class certification (consolidated class case) | Schedule TBD after dispositive motions in class cases resolved |

**Appointment of Leadership Counsel**. Defendants' proposed schedule follows common practices in complex MDL cases.  It provides for the appointment of Leadership Counsel at the outset, in accordance with the Court's expressed intention in Case Management Order No. 1 (Dkt. 14 at 2) and the filing of a superseding Consolidated Class Action Complaint (*see infra* Section III).

**Technology Tutorial.**  Defendants' proposed schedule includes a placeholder for a technology tutorial during the discovery period.  Defendants propose holding a technology tutorial for Your Honor and Magistrate Judge Wang to help ground discussions throughout the case about different aspects of the accused technology.  Although Defendants responded to questions about the technology that the Court posed during the hearing on Defendants' motions to dismiss, Defendants have in mind here a much more detailed tutorial, with demonstratives, that Defendants believe will significantly aid the Court in its consideration of these matters. Defendants will be prepared to discuss this proposal with the Court at the initial conference.

**Written Discovery and Document Productions Followed by Depositions.** Defendants' proposed schedule allows the parties to complete written discovery and substantially complete document productions prior to taking depositions.  This is both a common practice in modern MDLs and one the *Authors Guild* class counsel insisted on in previous scheduling negotiations.  *See, e.g.*, Manual for Complex Litig. § 40.24 (sample scheduling order with document production and written discovery complete before depositions); *In re Future Motion, Inc. Prods. Liab. Litig.*, No. 5:23-md-3087 (N.D. Cal.), Dkt. 207 (scheduling order with written fact discovery close before "commencement of non-written fact discovery," including depositions).  Defendants' proposed schedule allows for prompt coordination on discovery protocols, including an omnibus protective order, ESI order, source code order, and a deposition

protocol that includes meaningful limits on deposition hours.[26]  Defendants maintain that each witness—whether defense, plaintiff, or third-party—should testify one time in a single, coordinated deposition attended or represented by all parties seeking to question the witness; indeed, this was one of the primary reasons the JPML instituted the MDL.  *See* Transfer Order at 3 (noting that the parties "have been unable to agree on a deposition coordination protocol to eliminate duplicative depositions of defense witnesses").  As Defendants have previously argued, the alternative would require witnesses to sit for multiple, duplicative depositions about the same legal and factual issues.  *See, e.g.*, *NYT* Dkt. 382.  That outcome is simply unworkable here, particularly given Plaintiffs have collectively sought over 100 depositions.  While Defendants disagree that 100 depositions of defense witnesses are necessary to promote the "just and efficient conduct" or resolution of these centralized pre-trial proceedings, *see* 28 U.S.C. § 1407, Defendants' proposed schedule allows for depositions to be completed at a brisk but realistic pace following substantial completion of document productions.

**Summary Judgment Before Class Certification.**  Defendants' proposed schedule appropriately sequences summary judgment before class certification.  The Court previously ordered that summary judgment would be briefed before class certification in the consolidated *Authors Guild* case.[27]  *See AG* Dkt. 56.  Nothing merits disturbing that sequencing now.

---

[26] Likewise, to the extent Plaintiffs intend to serve additional written discovery, they should coordinate to serve consolidated and non-duplicative discovery requests consistent with the JPML's centralization decision.  Defendants have already responded to more than 400 requests for production and more than 1400 requests for admission in the class cases alone.  Given the volume of Plaintiffs' discovery requests to date—and the resulting two million pages of discovery material produced by Defendants—Defendants anticipate that any further written discovery from Plaintiffs will be limited.

[27] Class Plaintiffs say that they should not be held to the *Authors Guild*'s previous stipulation to sequence summary judgment before class certification because OpenAI violated that stipulation by seeking centralization with the JPML.  That argument is facially absurd, as the stipulation expressly preserved OpenAI's right to seek centralization if "additional cases [were] filed raising similar claims" after the stipulation was executed.  *Raw Story*, *Intercept*, *Daily News*, *The Center for Investigative Reporting, and Petryazhna* (formerly *Millette*) were all filed after the stipulation and before OpenAI sought centralization.

Defendants' proposed sequencing promises significant efficiency benefits and is supported by controlling Second Circuit precedent. The fair use defense may moot class certification questions and streamline (and potentially even dispose of) multiple litigations, consistent with the Second Circuit's conclusion in *Authors Guild v. Google, Inc*. ("Google Books"). There, plaintiff alleged that Google committed copyright infringement by creating digital scans of books to create a new search engine. *Id.* at 208–29. The district court granted plaintiffs' Rule 23 certification motion *prior* to summary judgment, based in part on the suggestion that fair use could be resolved on a classwide basis. 282 F.R.D. 384, 394 (S.D.N.Y. 2012). But the Second Circuit later vacated the class certification order, holding that the district court's attempt to grapple with Rule 23's detailed requirements was premature in light of the likelihood that those issues would be *"necessarily inform[ed] and perhaps moot[ed]" by "resolution of [the] fair use defense in the first instance"* under Rule 56. 721 F.3d at 134 (emphasis added). The district court ultimately granted summary judgment to Google on fair use, entirely mooting the class certification question. *See* 804 F.3d at 207–08.

The issue of fair use of copyrighted material in training OpenAI's large language models arises in both the Books and News Cases. That overlap counsels in favor of sequencing summary judgment before class certification. Were the Court to certify a class without having decided the overlapping fair use issues first, Defendants respectfully submit that the Second Circuit would be likely to grant Rule 23(f) review, stalling proceedings for *all* parties in these centralized matters in the meantime. Class Counsel do not explain why it is necessary, appropriate, or the best use of the Court's resources to deviate from the process the Second Circuit directed in *Google Books* when the summary judgment proceedings will likely inform whether Plaintiffs could meet their burden of establishing all Rule 23 requirements. Notably, even a partial summary judgment order would narrow the issues and/or parties involved in certification questions. *See Waite v. UMG Recordings*, 2023 WL 1069690 (S.D.N.Y. 2023) (court granted summary judgment as to one of seven class representatives, then adjudicated (and denied) class certification without needing to consider that plaintiff's allegations). Whether or not summary judgment is

dispositive, the Court's consideration of that motion will clarify whether the disputed issues (like, for example, ownership, market harm, or substantial similarity between accused outputs (if any) and Plaintiffs' works) can be resolved on a class-wide basis through class-wide proof. If class certification is sequenced before summary judgment, the Court would have to rule based on hypothetical resolution of those issues (and others) and potentially have to revisit the ruling later based on summary judgment developments.

Plaintiffs' citations to two California cases—the *Tremblay* matter and the Anthropic matter—do not counsel for a different result. California courts, unlike this Court which is controlled by the Second Circuit's decision in *Google Books*, have taken a variety of approaches to the sequencing question. While the two cases Plaintiffs cite elected to sequence class certification either before or simultaneously with summary judgment, others have not. At least three California courts have sequenced summary judgment before class certification: Judge Chhabria in *Kadrey v. Meta*, Judge Breyer in *O'Nan v. Databricks*, and Judge Tigar in *Nazemanian v. nVidia*. In short, numerous courts both inside and outside this District have elected to sequence summary judgment before class certification in AI copyright matters–and this Court should do the same.

**Bifurcation**. Microsoft proposes that discovery on damages be bifurcated and that such discovery take place after summary judgment and class certification have been resolved and the scope of any potential damages claim is established. OpenAI does not oppose. To be clear, Microsoft recognizes that certain discovery related to actual damages overlaps with the fair use fourth-factor, particularly documents related to the market and potential markets for the works. Microsoft has already produced significant documents on these topics and will not use bifurcation of damages as an excuse to exclude such material from the scope of production. Rather, Microsoft's request is aimed primarily at disgorgement of profits. Discovery relating to this remedy could vary widely depending on the claims and/or plaintiffs remaining in the case, and it is exceedingly burdensome and has no relevance to issues of fair use. It is particularly burdensome for Microsoft, since the latest proposed scope of the claims would involve numerous

additional product lines throughout the company.  To be clear, Microsoft has objected to such discovery on relevance grounds because no Plaintiff could establish the required causation between infringement of a work-in-suit and Microsoft's company revenues.  *AG* Dkt. 374. Nevertheless, if required, producing discovery on disgorgement would involve product-line financials, including revenue and cost allocations by product.  Determining and locating that level of material requires first isolating the products using the models at issue, determining the applicable dates, determining line item revenue for products across Microsoft that vary widely in terms of scope and are managed by different teams, all despite the fact that the company often does not keep records in that form in the regular course of business, and then identifying and allocating costs across those product lines, again despite the business maintaining financials that are not designed to match that task.   None of this is necessary at this stage of the case and is likely to lead to extensive motion practice.  There is no harm or prejudice to delaying this type of discovery until after summary judgment and class certification.

**Reply Expert Reports**.  Assuming discovery concerning damages as noted above is bifurcated, Defendants' proposed schedule provides for three rounds of expert reports—opening reports, rebuttal reports, and reply reports— and expert depositions conducted in the four months following the close of fact discovery; and the sequencing of summary judgment before class certification, per the Court's previous order in the *Authors Guild* case.  *See infra* Section II.D; *AG* Dkt. 56.  If discovery concerning damages is not bifurcated, then Microsoft's proposal for damages reports includes four rounds to address the shifting burdens of proof under Section 504(b).

Contrary to Plaintiffs' suggestion, reply expert reports are necessary and will benefit the parties and the Court for multiple reasons. First, if the Court declines to bifurcate damages, reply reports are necessary because of the burden-shifting framework for disgorgement set forth in the Copyright Act. Under 17 U.S.C. § 504(b), plaintiffs have the initial burden of presenting proof of the alleged "infringer's gross revenue." Plaintiffs need to address that issue in an opening expert report. The burden then shifts to the defendants to prove "deductible expenses and the elements

of profit attributable to factors other than the copyrighted work." *Id.* Defendants would address those issues in a rebuttal report. If plaintiffs intend to offer any expert opinion regarding Defendants' deductible expenses and apportionment of profits, they would need to do so in a reply report.

Furthermore, regardless of whether the Court bifurcates damages, reply reports will significantly benefit the parties and the Court by ensuring that the issues are properly joined and there is a complete record for summary judgment and, if necessary, trial. This is especially true for fair use. Because fair use is an affirmative defense, Defendants intend to address that defense in their opening expert reports, which will be served at the same Plaintiffs serve their opening reports on copyright infringement and damages. Defendants cannot predict exactly what acts of alleged infringement Plaintiffs will address in their opening reports or what they will claim as damages or harm for any such acts. Reply reports on fair use will provide an opportunity to respond to the claims and theories of harm that Plaintiffs actually pursue and ensure that ***both*** parties are focused on the same conduct and claimed harm rather than talking past each other. This will benefit the Court and the parties in addressing the important issue of fair use.

Reply reports would not add unnecessary delay, as Plaintiffs suggest. The parties can and should work together to propose a reasonable schedule that allows for reply reports without adding any significant delay. Nothing in Rule 26 prohibits this and the Court has wide discretion to structure expert discovery in a way that will ensure "a just, speedy, and inexpensive" resolution of these cases. *See* Fed. R. Civ. P. 1; *see also Pharmacychecker.com, LLC v. Nat'l Ass'n of Bds of Pharm.*, 2021 WL 2477070, at *1 (S.D.N.Y. June 17, 2021) ("A district court has broad discretion to manage pre-trial discovery.") (quoting *Wood v. F.B.I.*, 432 F.3d 78, 84 (2d Cir. 2005)); *Graham v. Prince*, 15-CV-10160-SHS, ECF 67 (S.D.N.Y. Aug. 29, 2017) (providing for "[r]eply expert reports" after completion of responsive expert reports) (Stein, J.).

**Plaintiffs' Unrealistic Schedule**.  Plaintiffs opposed MDL treatment for these cases by arguing that the end of discovery is close at hand.  Yet Plaintiffs' Counsel conceded in response to questioning by the JPML that document discovery is not close to complete and that they

intend to take over 100 more depositions, and the JPML recognized the need for centralization. Yet, Plaintiffs' proposal returns to the fiction that discovery can be completed in short order. That is not true even with respect to Plaintiffs' claims as currently pleaded, and it would be even further from the truth if Plaintiffs follow through on their proposal to expand the scope of these cases.

As explained above, the Court should reject Class Plaintiffs' invitation to flip the current order in which the Court will address summary judgment and class certification. Even on its face, moreover, Class Plaintiffs' new proposal to have class certification briefing before fact discovery has closed and before expert discovery has even begun is infeasible. Class certification briefing will rely on the factual record and likely will involve competing expert reports. Plaintiffs' schedule also does not take account of the near-certainty of a Rule 23(f) petition, especially if the Court were to conduct class certification proceedings prior to ruling on summary judgment in the same manner the Second Circuit found inappropriate in *Google Books*.

Plaintiffs have also proposed to close all fact discovery in just six months, while at the same time requesting more than 100 depositions of defense witnesses alone, on top of the depositions that Defendants will need to take. Under Plaintiffs' approach, the parties would need to complete roughly *eight* depositions *per week* for the next six months straight. That is not realistic or appropriate. As another example, Plaintiffs have proposed a June 2025 substantial completion date, despite knowing that there are *hundreds* of requests that remain outstanding and require conferral between the parties. And this assumes that the scope of Class Plaintiffs' claims and classes do not change. As noted above, to the extent new or additional claims, products, or class definitions are permitted, not only would Plaintiffs' proposed schedule not be workable, but the Court and the parties would need to revisit and extend the schedule proposed by Defendants as the parties will be required to conduct significant new document discovery which cannot be accomplished within the time frames proposed by either side. Plaintiffs also seek to disregard the local rules on the timing for contention interrogatories, without any good cause for doing so. *See* S.D.N.Y. Local Rule 33.3. Plaintiffs' schedule does not work.

Plaintiffs' proposed schedule is unworkable for several other reasons.  First, it requires motions for summary judgment to be filed before the close of expert discovery.  This makes no sense because summary judgment motions likely will depend in part on expert testimony and the parties will need to cite deposition testimony from the experts in their summary judgment motions.  Second, Plaintiffs propose that *Daubert* motions be filed only seven days after the close of expert discovery.  This is impractical because *Daubert* motions will necessarily depend on and cite to admissions from expert depositions, and the parties need sufficient time to evaluate and draft *Daubert* motions after expert depositions have been completed.  Finally, Plaintiffs propose a different schedule for summary judgment motions and *Daubert* motions, and, contrary to this Court's Local Rules, omit any date for reply briefs in support of *Daubert* motions.  *See* Local Civil Rule 6.1(b).  Summary judgment and *Daubert* motions should be filed on the same date, with sufficient time <u>after</u> the close of expert discovery to draft the motions, and the schedule should allow for reply briefs for each.

### B.    Pretrial Motions

#### 1.    Class Plaintiffs' Proposal

*Authors Guild* Plaintiffs will move for class certification. *Authors Guild* Plaintiffs may move for summary judgment on discrete issues after careful consideration. For the reasons explained above, class certification should be briefed before summary judgment.

Moreover, while no experts have been disclosed under Rule 26, Class Plaintiffs may file *Daubert* motions, and Class Plaintiffs also anticipate filing motions *in limine* in advance of trial.

#### 2.    News Plaintiffs' Proposal

Each News Plaintiff anticipates moving for summary judgment on some or all claims and defenses. As discussed above, News Plaintiffs respectfully request that summary judgment briefing in the News Cases not trail class certification in the Class Cases. Specifically, the resolution of the class certification issue in the Class Cases has no bearing on the News Cases.

Moreover, while no experts have been disclosed under Rule 26, News Plaintiffs may file

*Daubert* motions, and News Plaintiffs also anticipate filing motions *in limine* in advance of trial.

Finally, News Plaintiffs may also move for spoliation sanctions to address OpenAI's ongoing deletion of output log data. *See* Dkt. 539 (News Plaintiffs' May 7, 2025 Letter addressing this dispute).

### 3.    Defendants' Proposal

Defendants intend to move for summary judgment on, at a minimum, (a) fair use, substantial noninfringing uses, and DMCA § 512 safe harbor in response to Plaintiffs' copyright claims; (b) lack of scienter in response to Plaintiffs' DMCA § 1202 claims; (c) lack of trademark use, lack of fame, lack of likely dilution on News Plaintiffs' trademark claims.[28]  As explained in Section V.A.2 above, Defendants respectfully request summary judgement be briefed before class certification.

## VI.    SETTLEMENT DISCUSSIONS AND MEDIATION/ARBITRATION

Plaintiffs and OpenAI attended a settlement conference in the consolidated *Tremblay* matters with Magistrate Judge Sallie Kim of the Northern District of California on June 18, 2024.  No settlement was reached.

Plaintiffs in the consolidated *Tremblay* matters, the consolidated *Authors Guild* matters, The Times, The Intercept, and OpenAI have engaged in subsequent alternative dispute resolution efforts, but those efforts have not resolved the matters.

The parties believe further mediation or settlement conferences are premature at this time.

## VII.    RELATED ACTIONS

### A.    *Ziff Davis, Inc. et al. v. OpenAI, Inc. et al.* (D. Del. filed Apr. 24, 2025)

On April 30, 2025, OpenAI filed a Notice of Potential Tag-Along Action with the Judicial Panel on Multidistrict Litigation. *See In re OpenAI Inc. Copyright Infringement Litig.*,

---

[28] Defendants may also bring *Daubert* motions or seek leave to file additional motions for summary judgment.

MDL No. 3143, Dkt. 87. The JPML issued a Conditional Transfer Notice on May 6, 2025, *id.* Dkt. 88, which was finalized on May 14, 2025, and entered on this Court's docket on May 16, 2024.  Dkt. 41. Liaison Counsel for the News Plaintiffs has already been in touch with counsel for Ziff Davis to ensure their inclusion in the MDL is smooth.

### B.    Procedure for Identifying Future Related Actions

If the parties become aware of any additional related actions, they will promptly evaluate whether filing a Notice of Potential Tag-Along Action with the JPML is appropriate.

## VIII.   PARTIES AND AFFILIATES

*See* attached Exhibit C.

## IX.    ADDITIONAL CONTENT

### A.    Plaintiffs' Issues

#### 1.    Deposition Protocol

##### a.    Plaintiffs' Position

Prior to the MDL panel issuing its order, the parties had met and conferred at length about an appropriate deposition protocol for this case. On March 7, counsel for OpenAI, Microsoft, the SDNY class and the News cases (NYT, DN, CIR and, together with the SDNY class "NY plaintiffs") met in Judge Wang's courtroom to further confer about efforts to coordinate depositions across cases and with the N.D. Cal. class case. The parties left with a draft term sheet and reported to the Court that the parties were close to an agreement that contemplated Defendants' witnesses sitting for one deposition across the cases where feasible, with specific hours caps allocated to News Plaintiffs, SDNY class plaintiffs, and N.D. Cal. class plaintiffs. The parties ultimately did not reach agreement because of a dispute about the ability of the New York plaintiffs to take OpenAI 30(b)(6) depositions on the N.D. Cal. Schedule, before OpenAI's substantial completion of document production. For that reason, only a very limited number of depositions have been taken to date. Now that the cases have been consolidated into an MDL, Plaintiffs are in the process of compiling a revised proposal, which they will share with

Defendants ahead of the May 22 conference, and will diligently meet and confer with Defendants thereafter. Plaintiffs respectfully request that the Court order all parties to file by June 5, 2025 a stipulated deposition protocol or, if the parties are not able to reach agreement, to cross-file 5-page letter briefs regarding a deposition protocol for final decision by the Court.

### b.    Defendants' Position

A central reason for this MDL proceeding has been the Parties' inability to agree upon an appropriate deposition protocol, primarily because of the cases proceeding on different schedules in different jurisdictions, and Plaintiffs' related inability to informally coordinate among themselves.  Unfortunately, that conduct has continued since the MDL order, with the various plaintiffs serving 24 subpoenas on 13 former employees without any coordination whatsoever.

Defendants agree that Magistrate Judge Wang should order, either upon the Parties' stipulation or after appropriate briefing, a comprehensive deposition protocol in which each individual witness sits for a single, coordinated deposition attended or represented by any party seeking to question the witness. Defendants are in the process of preparing a revised protocol proposal, which they will share with Plaintiffs ahead of the May 22 conference, and will diligently meet and confer with Plaintiffs thereafter.  Magistrate Judge Wang has overseen the process for the negotiation of the deposition protocol to date, including two settlement conferences to facilitate the Parties' discussions, and is familiar with the issues and the Parties' respective concerns and positions.  Accordingly, Defendants see no reason to deviate from that process and respectfully request that Magistrate Judge Wang address and oversee the process for proceeding to resolution on the protocol and that it be included as an agenda item for the May 27 status conference before her Honor.

### 2.    Protective Order

### a.    Plaintiffs' Position

Orders providing for the production and use of confidential discovery material have previously been entered in the cases prior to JPML's order. Despite that, Defendants objected to

Plaintiffs sharing or having access to material produced in other cases. This has caused unnecessary expense and delay. Now that the cases are consolidated for pretrial purposes, there is no reason to perpetuate this. For all cases in which discovery is open and the parties are subject to a court-entered protective order, Plaintiffs' attorneys should be permitted to discuss material designated confidential or highly confidential under their respective protective orders. For the avoidance of doubt, this would exclude any cases where discovery is not yet open (unless and until discovery opens in such cases and a protective order is entered) and would not permit plaintiffs in cases in which Microsoft is a defendant to discuss materials which Microsoft has designated with plaintiffs in cases in which Microsoft is not (or is not yet) a defendant. But, if a plaintiff retains an attorney or expert for multiple cases in the MDL, where Microsoft is a party in some cases but not others, Plaintiffs may discuss material designated confidential or highly confidential by Microsoft with those attorneys and experts provided that those attorneys and experts do not discuss that material with the parties in cases where Microsoft is not a defendant.

In addition, both Defendants should cross-produce all of their documents across all MDL cases in which they are a defendant with the same bates prefix. Both of these measures are critical for Plaintiffs to implement the coordination that Defendants say they desire.

If Plaintiffs cannot, for practical or protective-order reasons, discuss confidential material with one another, they cannot be expected to coordinate on depositions, subpoenas, or requests for production.

Defendants have refused these requests. The only explanation given by either Defendant for that refusal was a vague reference by OpenAI to supposed third-party issues. Microsoft gave no reason at all. OpenAI has failed to explain what these third-party issues might be or why the current protective orders do not resolve them. Defendants' refusal to allow Plaintiffs to fully collaborate gives the lie to their claim, advanced in their briefing before the JPML, that they seek to streamline these cases and limit the burden on Defendants. Instead, their goal is to hamstring Plaintiffs' prosecution of this action, even where such measures would promote efficiency. The

Court should order Defendants to cross-produce all documents across all cases in this MDL and allow fulsome discussions and exchanges among Plaintiffs.

Plaintiffs believe this issue has been fully discussed among counsel, and briefed to the Court. *See* Dkt. 347; 380. And thus request the Court order the requested relief at the May 22, 2025, conference. If the Court is unwilling to decide this issue on the current papers, Plaintiffs respectfully request the Court order all parties to cross-file 2-page letter briefs regarding relief under the protective order by May 29, 2025, for final decision by the Court.

Plaintiffs agree with Defendants that an omnibus protective order would be valuable and will participate in good faith negotiations to arrive at a stipulated protective order. To the extent the parties are not able to reach agreement, such omnibus protective order should be subject to the June 5, 2025 briefing date.

If the Court orders cross-production and authorizes plenary discussions prior to the entry of an omnibus protective order, Plaintiffs should be permitted to discuss and exchange protective order materials prior to the entry of such order, with all exchanges and discussions of protective order material in that period subject to the highest level of protection under any of the protective order provisions to which such material is subject until the omnibus is entered.

### b.    Defendants' Position

Defendants agree the Court should enter an omnibus stipulated protective order to govern the use and disclosure of confidential materials in the MDL.  Continuing to operate under multiple different protective orders, entered by different Courts, and with different requirements, is not workable.  Far from refusing to engage with Plaintiffs on this issue, Defendants have offered to draft an omnibus protective order—along with an omnibus ESI protocol—and will be ready to share drafts with Plaintiffs imminently.

Despite their agreement that an omnibus protective order is necessary, Plaintiffs nevertheless ask the Court to order Defendants to immediately re-produce millions of documents with a new Bates-prefix.  Plaintiffs do not offer to reciprocate.  Had Plaintiffs waited to review

Defendants' draft proposed orders, they would know that Defendants intend to reproduce discovery materials across the consolidated cases, but it makes no sense to try to do so subject to four distinct protective orders and ESI protocols. Similarly, as Plaintiffs acknowledge, the reality is the parties have to work through certain issues, including that not all Plaintiffs have claims against Microsoft (and thus any need for its discovery materials), and Defendants have contractual notice obligations they must satisfy before disclosing certain third-party materials to additional parties.

The Court should allow the negotiation process to take its course so that the parties can work through these issues. The parties can do so efficiently and Defendants have no objection to a June 5, 2025, deadline to submit a proposed stipulated protective order and ESI protocol, or competing proposals.

Finally, Plaintiffs propose that, until an omnibus protective order is entered, outside counsel for Plaintiffs in actions with open discovery should be allowed to discuss Defendants' confidential materials, provided they afford them the highest level of confidentiality protection available under an existing protective order.[29] While that approach may be workable for certain discovery materials, for others, Defendants would still have to comply with notice obligations to third parties first. It makes sense to do so with the benefit of the omnibus protective order that all parties (and non-parties) can reference and follow. With that being said, Defendants have been, and remain, willing to work with Plaintiffs' counsel to ensure they have what they need for coordination. For example, when counsel for Class Plaintiffs asked to exchange draft complaints and a limited universe of underlying confidential materials, Defendants agreed so that Class Plaintiffs could make progress on a Consolidated Class Complaint. There is no need to order Defendants to reproduce discovery or share highly sensitive materials without an omnibus

---

[29] Defendants interpret Plaintiffs' proposal to mean all confidential materials would be treated as "Highly Confidential – Outside Counsel's Eyes Only" under the modified protective order entered in the Authors Guild cases, until an omnibus protective order is entered in the MDL. *See AG*, Dkt. 338.

protective order and ESI protocol in place.  Doing so is certain to cause confusion and waste.

###### 3.   Status of Discovery

####### a.   Plaintiffs' Position

Neither the Times, nor the Daily News, nor *Authors Guild* Class Plaintiffs have received a non-overlay production from OpenAI since April 1, six weeks ago. N.D. Cal. Class Plaintiffs have likewise not received any new documents in response to RFPs. Other than productions of plaintiff-specific training data, CIR and Intercept have not received anything either. OpenAI has ignored emails requesting meet and confers or refused to provide dates, and at the few meet-and-confers it has agreed to attend, it has refused to advance discovery during this period. Microsoft has not made a production of its own documents to *Authors Guild* since April 14, 2025. Defendants assert that they have proceeded with discovery, but they do not deny that they have halted document discovery. As for their suggestion that they have not ignored Plaintiffs requests to meet and confer, it is belied by their own example: OpenAI's correspondence with *Authors Guild* Plaintiffs about their RFPs "just 3 days ago" was only after Plaintiffs followed up, and in that email OpenAI refused to provide a date to meet-and-confer as Plaintiffs had requested. Plaintiffs believe that this unilateral stay of discovery is inappropriate and respectfully request that the Court clarify at the May 22, 2025 hearing that this unilateral stay cannot stand.

####### b.   Defendants' Position

Plaintiffs' suggestion that Defendants have engaged in a unilateral stay is both frivolous and false.

Microsoft answered the pleadings against it, has continued to review documents and prepare them for production, has held multiple discovery meet and confers, has served and responded to written discovery, and has led the negotiations regarding a comprehensive deposition protocol.  In addition, Microsoft has produced source code for inspection.  As soon as Microsoft has guidance regarding cross-production and the scope of the cases to which it is a party, it will be able to label documents and resume production.

Similarly, the allegation as to OpenAI is as frivolous as it is non-specific.  Since the entry of the MDL order, OpenAI has served two sets of RFA responses, four sets of RFP responses, and two sets of interrogatory responses across the various cases, among other discovery materials, and has produced thousands of documents.  OpenAI has also made training data available for inspection on numerous occasions and expects to make further document productions prior to the May 22 conference.  Nor has OpenAI been ignoring requests to meet and confer, as Plaintiffs disingenuously suggest.  To the contrary, OpenAI has met and conferred with Plaintiffs on a variety of their discovery requests (a demand for a new custodian, a demand for supplemental interrogatory responses, and documents/data requests), including on April 21, May 1, May 2, May 5, and May 15, to say nothing of the numerous emails it has exchanged with various Plaintiffs about their respective discovery demands.  For example, OpenAI most recently corresponded with The Times and the Authors Guild Plaintiffs about their respective RFPs just 3 days ago.  And OpenAI offered to meet and confer with the Intercept Plaintiff four days ago about its discovery requests, but the Intercept has not responded.  These efforts demonstrate an effort to "advance discovery," notwithstanding Plaintiffs' incorrect suggestion otherwise.

Plaintiffs' verifiably false assertion that OpenAI has been "ignor[ing] emails" is particularly surprising given Plaintiffs' failure to follow up in a timely manner on their own requests.  For example, OpenAI met and conferred with The Times on The Times' demand for yet another custodian on April 21, and though The Times represented it would follow up on the conference, it did not do so for over three weeks.  Similarly, OpenAI met with the N.D. Cal. Plaintiffs on May 2 to discuss a laundry list of their discovery requests but have yet to hear anything since.  The Author's Guild Plaintiffs only began corresponding with OpenAI about their discovery requests last week.  In other words, they said nothing about their discovery requests for over a month after receiving the MDL Order.  For their part, Plaintiffs have not cooperated with OpenAI on various of their own discovery deficiencies.  For example, the Daily News Plaintiffs have failed to respond to a deficiency letter OpenAI sent more than three weeks ago.  OpenAI intends to continue working with Plaintiffs to resolve these disputes without the

need for Court intervention and hopes Plaintiffs will cooperate in that attempt rather than continue casting aspersions.

### 4.    Third Party Discovery

#### a.    Plaintiffs' Position

Third-party discovery is ongoing. Plaintiffs have served subpoenas on OpenAI and Microsoft former employees and various publishing companies and financial institutions. Contrary to Defendants' statements, Plaintiffs have been coordinating closely on third-party discovery, as exemplified by the fact that the subpoenas served have been identical or nearly so, the presence of a representative of each News, *Authors Guild* and *Tremblay* Plaintiffs on each meet-and-confer for several weeks, and the establishment of a subpoena subgroup that has been on every recent email with former employees. Though many of Plaintiffs' document subpoenas to former employees were served several months ago, several former employees (including third parties represented by OpenAI's counsel at Keker, Van Nest, & Peters) have yet to produce a single document and cannot provide any timeline for their productions. Many of these third parties cite CMO No. 1, potential consolidation of complaints in the MDL, and unidentified concerns with the various protective orders as bases for their delayed productions. Plaintiffs disagree that there is any basis for third parties to delay producing documents that Plaintiffs requested months ago and respectfully request the Court issue guidance to the effect that third parties are expected to participate in good faith in discovery now.

#### b.    Defendants' Position

As Plaintiffs note, third-party discovery is ongoing.  Unfortunately, Plaintiffs have not coordinated on third-party discovery. Since the April 3, 2025 MDL order, Plaintiffs served 24 subpoenas on 13 different former OpenAI and Microsoft employees.  The third parties' counsel, have been meeting and conferring with Plaintiffs regarding those subpoenas.

5. **Discovery Conferences**

a. **Plaintiffs' Position**

Plaintiffs respectfully renew their request for ongoing discovery hearings with Magistrate Judge Wang. *See Times* Dkt. 243 (denying "without prejudice" Plaintiffs' "motion for bi-monthly status conferences"). Plaintiffs submit that monthly conferences through the close of fact discovery will ensure the parties conclude discovery as quickly and efficiently as possible.

Courts often schedule regular discovery conferences in cases like these which generate numerous disputes. *E.g., Matter of Skanska USA Civ. Se. Inc.*, 2023 WL 7131834, at *3 (N.D. Fla. Oct. 27, 2023) (recapping "weekly discovery conferences," which "ensur[ed] the parties stayed on track for trial with their discovery and that discovery disputes were handled expeditiously"); *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, 328 F.R.D. 100, 105 n.3 (S.D.N.Y. 2018) (describing how the magistrate judge "held regular, monthly telephone conferences with the parties," where, "[p]rior to each conference, the parties would submit a Joint Letter regarding any discovery disputes to be discussed during the conference.").

As the parties resume depositions, it is likely that new disputes will arise, including disputes over apex witness arguments and disputes concerning requests that arise from deposition testimony. Monthly discovery conferences will ensure that depositions proceed apace. Moreover, agreements are often reached on the eve of discovery hearings, which means that even the specter of ongoing conferences will likely minimize disputes and keep discovery moving quickly toward conclusion.

If the Court is willing to schedule monthly conferences, Plaintiffs respectfully request the Court provide advance notice—e.g., holding conferences the first Tuesday of every month—to the extent it is feasible, to accommodate the schedules of the many lawyers involved in this MDL, many of whom are not local to the New York area.

b. **Defendants' Position**

Magistrate Judge Wang has been conducting regular discovery conferences. Plaintiffs seem to request that this Court should direct Judge Wang to hold conferences more frequently,

but Defendants do not believe such a direction is necessary or appropriate. Judge Wang is in the best position to determine whether, and when, discovery conferences are needed. Over the past year, Magistrate Judge Wang held numerous conferences, including on September 12, 2024, October 30, 2024, December 3, 2024, January 22, 2025, January 31, 2025, and March 7, 2025. The parties are scheduled to appear again on May 27, 2025. There is no need to impose a burdensome, recurring process on the Court and the parties, and Magistrate Judge Wang previously rejected a similar proposal from Plaintiffs for a set monthly schedule. *See* Dkt. 243.

Monthly discovery conferences will not result in more expeditious resolution of discovery. As the Parties and the Court are well aware, preparing for and attending each discovery conference entails an enormous investment of time and resources for the parties and Magistrate Judge Wang. Requiring such conferences on a monthly basis will divert precious resources from the pressing work of wrapping up discovery and moving the case forward. Should Magistrate Judge Wang determine conferences are needed, she is best positioned to determine the cadence at which they occur. Forcing such conferences to happen on an artificial schedule every month may incentivize less compromise, not more.

### 6.    Ziff Davis Case

#### a.    Plaintiffs' Position

Ziff Davis filed its complaint against the OpenAI Defendants on April 24, 2025, in the U.S. District Court for the District of Delaware. The JPML issued a conditional transfer order on May 6, 2025, which was finalized on May 14, 2025. As such, OpenAI has not yet responded to Ziff Davis's pleading and fact discovery has not yet commenced.

Ziff Davis generally supports the schedule proposed by Plaintiffs, including the fact discovery cutoff and subsequent deadlines. Ziff Davis has not yet received access to OpenAI's document production or confidential discovery responses, which are subject to protective orders. Upon receiving those materials, Ziff Davis will diligently review them so that it can promptly serve its own initial non-duplicative discovery requests. It will likewise endeavor to diligently

respond to any discovery requests propounded by OpenAI. Ziff Davis proposes to meet-and-confer with OpenAI after the parties exchange initial requests in order to set a further timetable for substantial completion of productions, as well as to discuss other interim deadlines (if necessary) that may be applicable, including with respect to discovery and amendments to the pleadings.

In order to facilitate this process—and so that Ziff Davis can promptly participate in any on-going discovery—Ziff Davis asks that the Court deem fact discovery "open" in the Ziff Davis case. Counsel for Ziff Davis has already reached out to counsel for OpenAI to request access to materials previously produced in the consolidated cases. In the meantime, Ziff Davis and its counsel have agreed to comply with the relevant protective orders and procedures with respect to any such discovery materials produced, pending the opening of discovery in this case.

Given that it has not received (much less reviewed) any discovery material, Ziff Davis also reserves the right to seek limited accommodations from the Court in the event that there are discovery delays beyond its control, to ensure that Ziff Davis can effectively complete fact discovery without suffering any prejudice to its claims. Ziff Davis likewise reserves the right to seek supplementation as to any on-going discovery disputes, if necessary.

OpenAI argues that the inclusion of the Ziff Davis case may "upset the course of this consolidated action" despite that (1) OpenAI is the party that sought consolidation in an MDL in the first instance; (2) OpenAI initiated the transfer of the Ziff Davis case by filing a Notice of Potential Tag-along Action in the JPML, stating its belief that the cases share common questions of law and fact; (3) addition of tag-along cases to MDL proceedings is routine and expected; (4) the transfer has occurred before the initial case management conference; and (5) Ziff Davis is willing for fact discovery to proceed in parallel with any OpenAI Rule 12 motion (due May 20, 2025). While OpenAI complains that it has not had the opportunity to serve discovery on Ziff Davis, Ziff Davis is willing to begin fact discovery immediately (*see* Fed. R. Civ. P. 26(d)(1), allowing parties to stipulate to begin discovery at any time), and as noted above, asks this Court to declare discovery in this case open immediately.

OpenAI's stated concerns culminate in an extraordinary proposal: That the newly-transfer case be stayed (without indicating how long or for what purposes) or that Ziff Davis be in some way prevented from litigating any claims that are not already being litigated by other Plaintiffs. Neither proposal has any basis in fact or law. Although OpenAI waited inexplicably long to seek consolidation in a multi-district litigation, this MDL has just commenced, and this action just transferred. It appears to be unprecedented to stay a tag-along action transferred into an MDL this early in the proceeding. Staying this action post-transfer would all but guarantee duplicative discovery, and thus undermine the very judicial efficiency an MDL aims to achieve and deeply prejudice Ziff Davis.[30] Further, MDL consolidation clearly does not provide OpenAI with an opportunity to deprive Ziff Davis of its right to assert a valid cause of action in its own case.

### b.  Defendants' Position

As the Ziff-Davis plaintiffs concede, they only filed their complaint against OpenAI on April 24, 2025, and OpenAI has not yet responded to the Complaint.  While the Ziff-Davis complaint shares some core issues with the other actions in this coordinated proceeding, it also includes a different claim that has not been asserted in any other action.  OpenAI will have a Rule 12 motion in response to the *Ziff-Davis* complaint.

Ziff-Davis's tag-along complaint should not upset the course of this consolidated action. Specifically, nothing about the Ziff-Davis action should permit multiple depositions of any party or third-party witness, nor should it create a different date for the filing of dispositive motions.

Ziff-Davis suggests that it can accommodate the schedules proposed here for the coordinated actions if OpenAI simply makes all the discovery it produced in all actions (whether

---

[30] Indeed, in its original Transfer Motion, OpenAI asserted that "the cases remain in sufficiently similar procedural posture that Section 1407 makes sense now. While some cases have progressed further in document discovery than others, modest differences in procedural posture should not be a barrier to Section 1407 centralization where (1) no case has proceeded to depositions; (2) no expert reports have been exchanged; (3) no class certification motion has been filed; and (4) no summary judgment motion has been filed." Dkt 1-1, MDL No. 3143. Yet having now achieved consolidation, OpenAI apparently wishes to foreclose the inconvenience of defending any further cases and pervert the MDL process to try to cut off claims it might face from new parties.

relevant or not to Ziff-Davis) available to it.  But Ziff-Davis ignores that OpenAI has not had the opportunity to respond to the complaint, or to serve discovery against Ziff-Davis to develop the record necessary to defend itself against Ziff-Davis's claims.  OpenAI is considering two options which it will be prepared to discuss at the May 22 conference: staying the Ziff-Davis action in light of its tardiness, or limiting the scope of its claims to the claims asserted in the other News actions.  Either option would be consistent with using this MDL proceeding to efficiently move the parties through common issues and discovery.

B.    **Defendants' Issues**

Defendants have each filed objections to discovery orders in the consolidated *New York Times* and *Authors Guild* cases that remain pending before this Court.  *See NYT* Dkts. 362-363, 368-369, 371-373; *AG* Dkts. 298-299, 300-301.  The resolution of those objections may impact the scope of discovery.

Respectfully submitted,

Dated: May 16, 2025                SUSMAN GODFREY LLP


By:   */s/ Davida Brook*
      Davida Brook (*pro hac vice*)
      1900 Avenue of the Stars, Suite 1400
      Los Angeles, CA 90067
      Telephone:  (310) 789-3100
      Facsimile:  (310) 789-3150
      Dbrook@susmangodfrey.com


      Attorneys for The New York Times
      Company

Dated: May 16, 2025                              SUSMAN GODFREY L.L.P.

                                           By:   */s/ Justin A. Nelson*
                                                 Justin A. Nelson (pro hac vice)
                                                 1000 Louisiana Street, Suite 5100
                                                 Houston, TX 77002
                                                 Telephone: 713-651-9366
                                                 jnelson@susmangodfrey.com

                                                 Attorney for Authors Guild and
                                                 Alter Class Plaintiffs


Dated: May 16, 2025                              LIEFF CABRASER HEIMANN
                                                 & BERNSTEIN, LLP


                                           By:   */s/ Rachel Geman*
                                                 Rachel Geman
                                                 250 Hudson Street, 8th Floor
                                                 New York, NY  10013-1413
                                                 Telephone:  212.355.9500
                                                 rgeman@lchb.com

                                                 Attorney for Authors Guild and
                                                 Alter Class Plaintiffs


Dated: May 16, 2025

                                                 KLARIS LAW

                                           By:   */s/ Lance Koonce, III*
                                                 Lacy H. ("Lance") Koonce, III
                                                 161 Water Street, #904
                                                 New York, NY 10038
                                                 (917) 612-5861
                                                 Lance.koonce@klarislaw.com

                                                 Attorneys for Ziff Davis, Inc.,
                                                 Ziff Davis, LLC, IGN Entertainment, Inc.,
                                                 and Everyday Health Media, LLC


Dated: May 16, 2025                              RUTTENBERG IP LAW

By:   */s/ Guy Ruttenberg*
      Guy Ruttenberg (pro hac vice forthcoming)
      1801 Century Park East, Suite 1920
      Los Angeles, CA 90067
      (310) 627-2271
      Guy@ruttenbergiplaw.com

      Attorneys for Ziff Davis, Inc.,
      Ziff Davis, LLC, IGN Entertainment, Inc.,
      and Everyday Health Media, LLC

Dated: May 16, 2025                          ROTHWELL,   FIGG,   ERNST   &
                                             MANBECK, P.C

By:   */s/ Steven Lieberman*
      Steven Lieberman (SL8687)
      901 New York Avenue, N.W., Suite 900 East
      Washington, DC 20001
      Telephone:  (202 783-6040
      Facsimile: (202) 783 6031
      slieberman@rothwellfigg.com

      Attorneys for Plaintiffs
      Daily News, LP; The Chicago Tribune
      Company,   LLC;   Orlando   Sentinel
      Communications   Company,   LLC;   Sun-
      Sentinel Company, LLC; San Jose Mercury-
      News, LLC; DP Media Network, LLC; ORB
      Publishing,    LLC;    and    Northwest
      Publications, LLC

Dated: May 16, 2025                          COWAN   DEBAETS   ABRAHAMS   &
                                             SHEPPARD LLP

By:   */s/ Scott J. Sholder*
      Scott J. Sholder
      60 Broad Street, 30th Floor
      New York, New York 10010
      Telephone:  212.974.7474
      ssholder@cdas.com

                                        Attorney for Authors Guild and
                                        Alter Class Plaintiffs


Dated: May 16, 2025                     BURSOR & FISHER, P.A.


                              By:   /s/ Julian C. Diamond
                                    Julian C. Diamond
                                    1330 Avenue of the Americas, 32nd Floor
                                    New York, NY 10019
                                    Telephone: (646) 837-7150
                                    Facsimile: (212) 989-9163
                                    E-Mail:  jmarchese@bursor.com
                                     jdiamond@bursor.com

                                    Attorneys for Plaintiff Petryazhna


Dated: May 16, 2025                     BOIES SCHILLER FLEXNER LLP


                              By:   /s/ David Boies
                                    David Boies
                                    333 Main Street
                                    Armonk, NY 10504
                                    (914) 749-8201
                                    Fax: (914) 749-8300
                                    Email: dboies@bsfllp.com

                                    Attorneys for the Tremblay Plaintiffs


Dated: May 16, 2025                     JOSEPH SAVERI LAW FIRM


                              By:   /s/ Joseph R. Saveri
                                    Joseph R. Saveri
                                    601 California Street, Suite 1505
                                    San Francisco, California 94108
                                    Telephone: (415) 500-6800
                                    Facsimile:  (415) 395-9940
                                    Email:  jsaveri@saverilawfirm.com

                                    Attorneys for the Tremblay Plaintiffs

Dated: May 16, 2025                            CAFFERTY CLOBES MERIWETHER
                                                  & SPRENGEL LLP

By:   */s/ Bryan L. Clobes*
        Bryan L. Clobes
        135 South LaSalle Street, Suite 3210
        Chicago, IL 60603
        Telephone: (312) 782-4880
        Email: bclobes@caffertyclobes.com

        Attorneys for the Tremblay Plaintiffs

Dated: May 16, 2025                            MATTHEW BUTTERICK

By:   */s/ Matthew Butterick*
        Matthew Butterick
        1920 Hillhurst Avenue, 406
        Los Angeles, CA 90027
        Telephone:   (323) 968-2632
        Facsimile:    (415) 395-9940
        Email:     mb@buttericklaw.com

        Attorneys for the Tremblay Plaintiffs

                                     KEKER, VAN NEST & PETERS LLP

Dated:  May 16, 2025

By:   */s/ Robert A. Van Nest*
        ROBERT A. VAN NEST (*pro hac vice*)
        633 Battery Street
        San Francisco, CA 94111-1809
        rvannest@keker.com
        Telephone:  415 391 5400
        Facsimile:  415 397 7188

MORRISON & FOERSTER LLP

Dated:  May 16, 2025

            By:    */ s/ Joseph C. Gratz*
                    JOSEPH C. GRATZ (*pro hac vice*)
                    425 Market Street
                    San Francisco, CA 94105-2482
                    JGratz@mofo.com
                    Telephone:  415 268 7000
                    Facsimile:  415 268 7522

LATHAM & WATKINS LLP

Dated:  May 16, 2025

            By:    */s/ Andrew M. Gass*
                    ANDREW M. GASS (*pro hac vice*)
                    505 Montgomery Street
                    San Francisco, CA 94111
                    andrew.gass@latham.com
                    Telephone:  415 391 0600

                    Attorneys for Defendants
                    OPENAI, INC., OPENAI GP, LLC,
                    OPENAI, LLC, OPENAI OPCO LLC,
                    OPENAI GLOBAL LLC, OAI
                    CORPORATION, LLC, OPENAI
                    HOLDINGS, LLC

ORRICK, HERRINGTON & SUTCLIFFE LLP

Dated:  May 16, 2025

            By:    */s/ Annette L. Hurst*

ANNETTE L. HURST (*pro hac vice*)
The Orrick Building
405 Howard Street
San Francisco, CA 94105
ahurst@orrick.com
Telephone:  415 773 5700

FAEGRE DRINKER BIDDLE & REATH LLP

Dated:  May 16, 2025

By:    */s/ Jeffrey S. Jacobson*
JEFFREY S. JACOBSON
1177 Avenue of the Americas, 41st Floor
New York, NY 10036
jeffrey.jacobson@faegredrinker.com
Telephone:  212 248 3140

Attorneys for Defendant
MICROSOFT CORPORATION